# FRANK W. BOOTH v. CITY OF MINNEAPOLIS.[1]

May 8, 1925.

No. 24,710.

**Defendant's power of eminent domain for park purposes.**
    1. The city of Minneapolis under its charter may acquire lands for park purposes, even though such lands are located within the corporate limits of another municipality.

**Eminent domain as to lands adjacent to city.**
    2. Lands located 1½ miles from the city limits are adjacent to the city within the language of the city charter authorizing the acquisition of such lands for park purposes.

**Definition of public function.**
    3. Public function, as used in section 1271, G. S. 1923, includes public parks.

**Acquisition of public golf course.**
    4. Authority to acquire and maintain parks includes the authority to acquire and maintain a public golf course.

**Definition of park.**
    5. A park is a pleasure ground for the recreation of the public to promote its health and enjoyment.

    1. See Municipal Corporations, 28 Cyc. p. 954.
    2. See Municipal Corporations, 28 Cyc. p. 954.
    3. See Municipal Corporations, 28 Cyc. pp. 814, 953.
    4. See Municipal Corporations, 28 Cyc. p. 953.
    5. See Municipal Corporations, 28 Cyc. p. 953; Park, 29 Cyc. p. 1684.

    Action in the district court for Hennepin county by a taxpayer to restrain defendant city from purchasing a certain tract of land which it had contracted to buy. Plaintiff's motion for judgment on the pleadings was denied. Defendants' motion for judgment of dismis-

[1]Reported in 203 N. W. 625.

sal with prejudice, was granted, Molyneaux, J. Plaintiff appealed from the judgment. Affirmed.

*Frank W. Booth,* pro se.

*Thompson, Hessian & Fletcher,* for respondent.

WILSON, C. J.

Appeal from a judgment entered pursuant to an order for judgment on the pleadings in favor of defendant.

The city of Minneapolis, by its board of park commissioners, entered into a contract for the purchase of 207 acres of land 1½ miles outside of the city limits to be used for a public golf course. Plaintiff as a taxpayer sought to restrain the consummation of the project as illegal.

1. Part of the land is within the boundaries of the village of St. Louis Park. The village was made a party to the action but failed to appear. If the city has the right to acquire lands for the particular purpose, it is not important that part of the land is within the boundaries of another municipality. Nor is it necessary to decide now whether the regulations imposed by the city would be subordinate to the local laws of the municipality within whose boundaries the park is to be located. The fact that the city charter says that the board shall have the right to govern does not mean that it may disregard laws created by legislative bodies. Section 14, chapter 16, of the City Charter on Parks and Parkways authorizes the regulation of such parks within or without the city and the adoption of suitable ordinances for the proper enjoyment of the same.

2. Section 2, chapter 16, of the City Charter gives the city authority to devise, adopt and maintain parks in and adjacent to the city. Adjacent does not necessarily mean adjoining or contiguous or abutting. 1 Words and Prases, 184, 187. Hennessy v. Douglas County, 99 Wis. 129, 74 N. W. 983. The word as used must be given a broad construction. Hobart v. city of Minneapolis, 139 Minn. 368, 166 N. W. 411. The location of this particular land has a community of interest with the lands in the corporate limits of the city and by virtue thereof may well be considered adjacent. State ex

rel. v. Minnetonka Village, 57 Minn. 526, 59 N. W. 972, 25 L. R. A. 755. The land may be adjacent for one purpose and not for another purpose. This land is obviously so located as to be easily adaptable for the purpose for which it is to be used and hence we have no hesitation in saying that it is adjacent. The word is not inconsistent with the idea of something intervening; those tracts are adjacent which are not widely separated.

3. The home rule charter is based upon section 1271, G. S. 1923, which authorizes the city to take property without its boundaries "needed for the full discharge of any public function which it is permitted to exercise." It is suggested that "public function" relates to water supply, drainage and all forms of transportation. We see no justification for the limited construction. In fact a municipality has a peculiar interest in the recreation or the pleasure of the public. 19 R. C. L. 721. Public parks in all the metropolitan cities contain golf courses. The public courses in parks are within financial reach of all. The golf course being a place of recreation must be included in the terms "parks and parkways" as used in the city charter and "public function" as used in the statute. A park is a pleasure ground for the recreation of the public to promote its health and enjoyment. A public golf course is for the same purpose. Parks are used for public recreation by indulgence in tennis, pitching horse shoes, croquet, baseball, kitten ball, golf, walking, horseback riding, picnicing, skating, bathing and general out-door exercise, band concerts, maintenance of botanical and zoological gardens and other recreations. If ground be acquired for these purposes, it may be acquired for a part of them. It follows that the city has authority, under its charter, section 2, chapter 16, and also under the statute, section 1271, G. S. 1923, to acquire and maintain a public golf course. Capen v. City of Portland, 112 Ore. 14, 228 Pac. 105; Sutcliffe Co. v. City of Louisville, 205 Ky. 718, 266 S. W. 375; Uses of public parks, see note 18 A. L. R. 1246. But this view was not looked upon with favor in City of Bradentown v. State, 87, Fla. —, 102 South. 556. Section 1534, G. S. 1923, was never intended to and does not limit this authority. It does not meet the requirements of section 1300, G. S. 1923.

A public golf course does not come within the prohibitions of Burns v. Essling, 156 Minn. 171, 194 N. W. 404, which disapproved the spending of public money for a hockey rink in which a closely allied athletic association could "stage hockey games between a team whose salaries and expenses * * * were to be paid largely by the city * * * and other teams" and an admission would be charged spectators. The hockey players were not playing for recreation, but as a means of livelihood, nor did the public have free access to their game.,

Affirmed.