New Castle, Appellant, *v.* Lawrence County, et al.

176

Argued September 25, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Gilbert E. Long,* Assistant City Solicitor, with him *Robert M. White,* City Solicitor, for appellant.

*William E. McElwee, Jr.,* County Solicitor and Solicitor for School District of Shenango Township, with him *J. Roy Mercer, Ralph A. Cooper,* Solicitor for Township of Shenango, and *Weingartner & Mercer,* for appellees.

OPINION BY MR. JUSTICE LINN, November 26, 1945:
The City of New Castle, in Lawrence County, filed a bill against taxing authorities of the county and of Shenango Township, a township in the county, challenging their power to tax two public parks of the city, described in the record as Sylvan Heights Golf Course and as Cascade Park. To support its claim of immunity from taxation, the city relies on legislation passed pursuant to the constitutional provision, Article IX, section 1, providing, in part, ". . . the General Assembly

may, by general laws, exempt from taxation public property used for public purposes, . . ."

After responsive answers had been filed, the case was heard on the merits by the late Judge DICKEY, who by decree nisi rejected the claim of exemption of Sylvan Heights Golf Course, but sustained exemption of Cascade Park. Exceptions to the adjudication were filed, and were heard by a court in banc composed of Judge LAMOREE and President Judge ROWLEY, who, while agreeing with Judge DICKEY that the golf course was taxable, held that part of Cascade Park was also taxable, "namely, one building, Funny-house, appraised at $4,000.00, one storage house appraised at $300.00, one pavilion appraised at $16,000.00, one Merry-Go-Round appraised at $1,500.00, eight houses (small) appraised at $800.00, one restaurant appraised at $1,500.00 and one Amusement building, Dodge 'Em, appraised at $800.00, . . ."

As the constitution exempts nothing but "permits the legislature to exempt, within the lines laid down for its guidance" (*Phila. v. Barber*, 160 Pa. 123, 28 A. 644) we turn to the legislation. New Castle is a city of the third class. The Third Class City Act of 1931, P. L. 932, section 3703, provides: "Cities may enter upon, take, use, purchase and acquire, by gift or by the right of eminent domain, lands, property and buildings, for the purpose of making, extending, enlarging, and maintaining public parks, parkways, playgrounds, playfields, gymnasiums, public baths, swimming pools, or indoor recreational centers, may levy and collect such special taxes as may be necessary to pay for the same, and make appropriations for the improvement, maintenance, care, regulation, and government of the same. . . . Lands, property and buildings outside the limits of the city may be taken for the purpose of a park, parkway, playground, and such lands may be annexed to the city in the manner provided by this act for the annexation of territory to a city."

Power to purchase land for a public park includes power to purchase or create a golf course for municipal use: *Golf View Realty Co. v. Sioux City*, 222 Iowa 433, 269 N. W. 451; *Booth v. City of Minneapolis*, 163 Minn. 223, 203 N. W. 625.

The General Assessment Law of May 22, 1933, P. L. 853, 72 P.S. 5020-204, provides: "The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to-wit:

"(g) All other public property used for public purposes, with the ground thereto annexed and necessary for the occupancy and enjoyment of the same, . . ."

Section 1101 of the Third Class City Law, Act of June 23, 1931, P. L. 932, Art. XI, section 1101, 53 P.S. 12198-1101, authorizes the creation by the city of a "Department of Parks and Public Property;" New Castle had such a department in charge of the two parks involved in this suit. The city had converted what had been the City Poor Farm, located in Shenango Township, about 3½ miles from the city, into a municipal golf course, designating it as a "park, playground and recreation center." We quote from the brief of the county solicitor this description of the golf course: The Sylvan Heights Golf Course "has four buildings located on the grounds. The first is an old type brick building converted into an auditorium or club room, a small locker room, and ladies' bath, and restaurant. In this building, sandwiches, soft drinks, golf balls, golf clubs, cigarettes, and cigars are offered for sale. Meals are also served, the charge being according to the menu selected. At times the club room is used by clubs at a fixed charge. A second building is an old barn used for the storage of equipment for the Golf Course, such as tractors, trucks, and tools. A third is a brick building in which is located an office for the manager of the Golf Course, space for golf racks for customers, a repair shop, and on the second floor, two small bedrooms, a locker

room and showers, and a rest room. The fourth building is a small stucco house formerly used as a pest house, but not used for any purpose since the property was converted into the Golf Course. The three buildings which are in use are used as incidental to the operation of the Golf Course. All of the 131 acres comprising the tract are occupied by the Course. None of it is adaptable to or available for use as a recreation park. It can be used only by Golf patrons. A fixed charge is made for playing either for 9 holes of play, 18 holes, by the day, or by the season. The season memberships are divided into senior memberships, junior memberships, etc., and different rates charged for each. The Golf Course is open to the general public, whether residents or non-residents of the City of New Castle, residents or non-residents of the township of Shenango, Lawrence County, where the Course is located. Fees are charged just as in the use of any ordinary Golf Course privately owned."

In *Laird v. Pittsburgh*, 205 Pa. 1, 54 A. 324, the court refused to restrain the City from enlarging Schenley Park for the purpose of erecting a library building on the addition. In the course of the opinion Mr. Justice MITCHELL said, "A public park in the popularly accepted meaning of the present time may be comprehensively defined as a public pleasure ground . . ." He added that "Should the city, therefore, decide to devote the land now in controversy to the enlargement of the Free Library Building it could not be fairly said to be a use outside of what is legitimately implied in the authority to take for a public park." See, also *Morrow v. Highland Grove Traction Co.*, 219 Pa. 619, 622, 69 A. 41; *Com. v. Hazen*, 207 Pa. 52, 57, 56 A. 263, dealt with a park which was not public. In *Dornan v. Phila. Housing Authority*, 331 Pa. 209, 221, 222, 200 A. 834, Mr. Justice HORACE STERN said: "The taking of land for a public golf course or playground would be for a public use although, while some players are using it, all other

members of the public are necessarily excluded from utilizing and enjoying the facilities. The difference in the duration of occupancy in these various instances is one of degree. It is not essential that the entire community or even any considerable portion of it should directly enjoy or participate in an improvement in order to make its use a public one."

The decree, so far as it relates to Sylvan Heights Golf Course, denies exemption on a theory, as we understand it, that there was no public use, within the meaning of the constitution and enabling legislation, but that, on the contrary, the city was engaged in a business enterprise competing with privately operated golf clubs. Without now considering what the effect of such a fact might require, we limit our consideration to the record which does not support the fact of business activity on which the theory is based and which must therefore be rejected. Referring to this subject, Judge DICKEY said in his adjudication, "It is to be regretted that the record in this case affords little aid to the Court in determining whether this course is operated in direct competition with commercial golf courses in the neighborhood. It has all the earmarks of a commercially operated golf course. It has never returned a profit, but we are acquainted with but few municipally managed properties that are profitable." While, as he said, the record afforded "little aid" to him, the court in banc went further: "We are not aware of our appellate courts yet having held a golf course to be property used for public or governmental [1] purposes. Furthermore, the Sylvan Heights Golf Course, though municipally owned and operated was in direct competition with private enterprises of the same type and kind situate within Lawrence County. The use of public property in competition in

---

[1] This indicates some confusion of thought on the subject because "The city acts in its corporate or proprietary capacity in maintaining its parks." *Honaman v. Phila.*, 322 Pa. 535, 539, 185 A. 750.

the same business with private property is not and ought not to be looked upon with favor. No greater discouragement to individual enterprise could exist. Further, it is through individual enterprise that the necessary revenue is derived by which government is carried on. . . .

"As to the right of the general public to use the facilities of the Sylvan Heights Golf Course, that right was contingent upon individuals' ability to pay the 'greens fee,' and it therefore cannot be said that the course was open to the free use of the general public. It appears to us that the Sylvan Heights Golf Course was used mainly for the convenience of the restricted class of individuals who play golf rather than for a general public purpose." The record does not support those inferences; the evidence which Judge DICKEY "regretted" was not in the record cannot be made the basis of inference.

It is common knowledge that municipalities maintain public golf courses in their parks just as they maintain baseball diamonds, tennis courts, and playgrounds equipped with appropriate devices; it is also common knowledge that, frequently, reasonable charges are imposed towards reduction of the general maintenance cost. The city has shown its right to immunity from the taxation complained of on the ground the property sought to be taxed is public property for public purposes within the statute. In support of its contention the county refers to *Pittsburgh School District v. Allegheny County,* 347 Pa. 101; 31 A. 2d 707, and *Easton v. Koch et al.,* 152 Pa. Superior Ct. 327, 31 A. 2d 747. Neither case is in point. The School District of Pittsburgh had a large lot which was not used for school purposes but was leased for the parking of automobiles; the use was for general business purposes and not for school purposes. In the *Koch* case it was held the land in question was not used for public purposes. For the same

reason the *Y.M.C.A. v. Philadelphia*, 323 Pa. 401, 187 A. 204, is not in point.

The Cascade Park situation is somewhat different. This park adjoins the city, contains 74 acres and is improved with a number of buildings. It is used by approximately 200,000 persons a year. Certain concession buildings are let on short term leases or licenses yielding about $3,790.00 annually, but the park is operated, as the finding states, ". . . at a definite loss to the City." The learned court held exempt from taxation "74 acres appraised at $25,000.00, 7 acres appraised at $700.00, 1 office building appraised at $1,000.00 and 1 acre of land; 1 storage house appraised at $300.00, 8 small houses appraised at $800.00," but held taxable "the following portions or parts of Cascade Park, namely, one building, Funny-house, appraised at $4,000.00, one pavilion appraised at $16,000.00, one Merry-Go-Round appraised at $1,500.00, one restaurant appraised at $1,-500.00 and one Amusement building, Dodge 'Em, appraised at $800.00."

These buildings are part of the park equipment available for the entertainment and refreshment of the public visiting the park, and promote and facilitate the enjoyment of the park for park purposes. The Department of Parks and Public Property of the City of New Castle has control over the portions of the park in which these licensees or lessees operate. No reason has been suggested why park visitors who desire refreshment or special entertainment should not pay reasonable charges for such additional park privileges. If the city directly, instead of by licensees, furnished these benefits it could make a reasonable charge therefor. As it acts in a proprietary capacity, it is immaterial that it finds it more convenient to supply refreshment and entertainment by its licensees: see *Bailey v. City of Topeka*, 97 Kansas 327, 154 Pac. 1014.

Counsel for the taxing authorities presents another contention to the effect that legislation authorizing the

establishment of public parks beyond the city's boundary is unconstitutional on the ground that, when established, such parks become exempt from local taxation; that, in establishing these parks, the city exercised an unlawfully delegated power to exempt real estate. Municipal bodies are agencies of the Commonwealth and subject to its legislation, limited only by constitutional provisions: see *Commonwealth v. Moir*,[2] 199 Pa. 534, 49 A. 351, and cases following it; *Mill Creek Township Annexation*, 74 Pa. Superior Ct. 275; *Baldwin Township Annexation*, 103 Pa. Superior Ct. 106, affirmed 305 Pa. 490, 158 A. 272. The legislation authorized the city to exercise a municipal right by determining that it was desirable to establish the parks. Such municipal action is not the exercise of a power to legislate tax exemption, but is a mere determination of the existence of the facts justifying the municipal creation of the parks: compare *Locke's Appeal*, 72 Pa. 491; *Tranter v. Allegheny Co.*, 316 Pa. 65, 76, 173 A. 289; *Baldwin Township Annexation*, supra. Tax exemption is not created by the city; the right to exemption was created by general law as an incident or attribute of certain classes of property, among them, public parks. The constitution limits exemption from taxation by Article IX, section 1, but it is, as Judge MITCHELL said in *Donohugh's Appeal*, 86 Pa. 306, 309, 310, ". . . a restriction upon a legislative power which would otherwise be unlimited and unquestionable. It is a tying up of the legislative hand, and, therefore, to be construed in a liberal spirit to remedy

---

[2] "Municipal corporations are agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined by the legislature, and subject to change, repeal, or total abolition at its will. They have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence. This is the universal rule of constitutional law, and in no state has it been more clearly expressed and more uniformly applied than in Pennsylvania."

the mischief at which it was aimed, and not further unnecessarily to fetter the proper governmental powers of the people's representatives." The constitutional provision was not self-executing; it was necessary that the legislature "by general laws, exempt from taxation public property used for public purposes, . . ." but the provision imposed no condition limiting the pre-existing right of the legislature with respect to the territorial limits of subordinate governmental agencies; legislative control over territory was not affected. A taxing authority must declare exempt any property within its taxing district if it is public property used for public purposes because the legislature has exempted such property, not because the city has selected the site for a public park. The state's agencies for governmental purposes have no vested right in the taxing power which cannot be affected by general laws. As the taxing power of counties and townships was subject to legislative control, there is nothing to support the argument that by establishing public parks, exempt because they were public parks, the city unconstitutionally affected the power of the local taxing authority.

Having concluded that the parks are exempt, we need not discuss procedure with respect to the tax liens referred to in the record; we must assume that the liens will be disposed of in the usual way by appropriate orders in the records of each lien.

So much of the decree as sustained the power to tax is reversed; the record is remitted with instructions to enter a final decree consistent with this opinion; costs to be paid as directed by the court below.