## Sposito v. City of Farrell et al.

*Nathan Routman*, for plaintiff.

*Joseph H. Broscoe*, for defendants.

ROWLEY, P. J., June 25, 1952.—This is a complaint in mandamus to require defendants:

"A. To fix grades of the members of the Police Force of the City of Farrell.

"B. To fix the compensation of the chief and other officers.

"C. To reinstate John J. Sposito as Chief of Police of the City of Farrell.

"D. To order the payment of the salary of the plaintiff, John J. Sposito, in compliance with the provisions of Ordinances Nos. 248 and 259 of the City of Farrell.

"E. To order the payment of the salary of the plaintiff, John J. Sposito, for the pay period ending April 30, 1952."

### Findings of Fact

1. The City of Farrell is a third class municipal corporation of the Commonwealth of Pennsylvania.

2. Michael Nevant is the duly elected and acting mayor, and Philip Russo, Arthur E. McCarthy, Michael Stefanish and Roy De Brakeleer are the duly elected and acting councilmen of the City of Farrell.

3. John J. Sposito, plaintiff, is a member of the police force of the City of Farrell.

4. On December 28, 1950, the Council of the City of Farrell did by ordinance no. 248 provide for a police force of 15 members consisting of a chief, two captains, one detective and one sergeant of police, to serve for a period of two years or until their successors were appointed and qualified.

5. On the first Monday of January 1952, act no. 164, a reënactment, revision, amendment and consolidation of the laws relative to cities of the third class, known as the Third Class City Code, became effective.

6. For some years prior to February 18, 1952, plaintiff Sposito served as chief of police. By ordinance no. 248, the compensation of the chief of police was fixed at $317.50 per month. By ordinance no. 259, enacted July 5, 1951, this compensation was increased to $333.38 per month. Plaintiff was paid at that rate until enactment of ordinance no. 0-1-1952.

7. On January 21, 1952, Mayor Nevant appointed John J. Sposito as Chief of Police of the City of Farrell.

8. On February 18, 1952 the Council of the City of Farrell, by ordinance no. 0-1-1952, did provide, inter alia:

"Section 1. The Police Force of the City of Farrell shall consist of eighteen (18) members, or so many thereof as the Mayor and Council may select from time to time, to be elected by the Mayor and Council as required by law, and the salary of said Policemen shall be Two Hundred sixty-nine and 86/100 ($269.86) Dollars monthly and these said officers shall perform such duties as the Council shall direct by Ordinance or Regulation.

"Section 2. The following Rules and Regulations shall govern the Police Department:

"(a) The patrolmen are assigned to their duties as per Schedule hereto attached and made a part hereof.

"(b) There shall at all times, during cruiser duty, be two Patrolmen in a cruiser.

"(c) Patrolmen shall be attired in uniform when on duty.

"(d) The shifts set forth in the Schedule attached hereto shall be rotated. No Policeman shall work on any one shift more than two consecutive weeks at a time.

"(e) Patrolmen on duty will report to headquarters hourly."

9. The schedule attached to the ordinance provided for three working shifts for policemen. Plaintiff Sposito was assigned to cruiser duty. The other policemen were assigned to cruiser, to desk, or to patrol of Idaho Street or Broadway. Each policeman changed shifts weekly.

10. On April 8, 1952, the mayor directed plaintiff Sposito, by written communication, as follows:

"You are therefore ordered in the discharge of your

duties to wear plain clothes while on duty until further notice."

11. On April 17, 1952, council adopted the following motion:

"That all policemen not in uniform during the next pay period will not be paid, this is according to Ordinance No. 0-1-1952."

12. Plaintiff has received no compensation for the period ending April 30, 1952.

13. Section 2001 of the Act of June 23, 1931, provided:

"The Council shall fix, by ordinance, the number, rank and compensation of the members of the city police force, who shall be appointed in accordance with the civil service provisions of this act."

This section was incorporated verbatim in the new Act of 1951.

14. Section 2002 of the Act of June 23, 1931, P. L. 932 (Third Class City Law), provided:

"The *Council* may designate, from the force, the chief and other officers who shall serve as such officers until their successors are appointed and qualified." (Italics supplied.)

15. For the last quoted provision, the Act of June 28, 1951, P. L. 662, sec. 2002, substituted the following:

"The *Mayor shall* designate, from the force, the chief and other officers who shall serve as such officers until their successors are appointed and qualified." (Italics supplied.)

16. Sec. 2007 of the Act of June 28, 1951, P. L. 662, provides:

"Policemen shall obey the orders of the Mayor and make report to him, which report shall be laid by him before council monthly. The Mayor shall exercise a constant supervision and control over their conduct."

17. Ordinance no. 248, which was in effect on February 18, 1952, when council enacted ordinance no. 0-1-1952, provided that the police force of the City of Farrell should consist of 15 members, from which there should be appointed a chief of police at a monthly salary of $317.50; two captains at a salary of $281.20 each; one detective at $281.20, one sergeant at $270, and 10 members at $257.

## Discussion

Decision of the instant litigation requires us to consider that section of the Third Class City Code which provides that council shall fix the rank of the members of the police force, also that section which provides that the mayor shall appoint a chief of police. Are these sections mandatory, which must be strictly followed, or are they directory and permissive only, which the municipal officers are free to disregard?

There is also involved the incidental question, who has the authority to direct the police force from day to day? Does the grant to council of power to make necessary regulations for the organization and government of the police force, authorize council to prescribe the duties of each individual policeman by a general ordinance, or does the legislative declaration that policemen shall obey the mayor and that the mayor shall maintain constant supervision and control of the police, constitute the mayor head of the police department?

Our solutions will be aided if we bear in mind that a municipal corporation is not a sovereign. It exists as a subordinate agency of the State. When the Commonwealth, through the legislature, has spoken upon a matter affecting municipal government, the mayor and council must strictly comply with the statute. The power of the Commonwealth to command is absolute.

The Commonwealth may not only prescribe regulations for organization and government of a police force

in a city; it may itself, if it should choose, appoint the members thereof without regard to the wishes of the locality. The authorities hereinafter cited indicate how frail is the power of a municipality and its officers when contested by a legislative mandate.

There is here presented an ordinance of a third class city which is at variance from a statute of the Commonwealth enacted to govern the administration of a third class city. The solution of the controversy involved rests upon determination of the question whether the statute or the ordinance predominates. More specifically, the point is as to the division of authority between the mayor and the council with respect to the police department.

The authority of the council is defined by section 2001 of the Third Class City Code (53 PS §12198-2001) which provides:

"The Council shall fix, by ordinance, the number, grades and compensation of the members of the city police force, who shall be appointed in accordance with the civil service provisions of this Act. . . .

"Council shall prescribe all necessary rules and regulations for the organization and government of the police force."

Section 2002 of the code, with respect to the authority of the mayor, directs:

"The Mayor shall designate, from the force, the chief and other officers who shall serve as such officers until their successors are appointed and qualified."

The code further provides in section 2007:

"Policemen shall obey the orders of the Mayor and make report to him, which report shall be laid by him before council monthly. The Mayor shall exercise a *constant* supervision and *control* over their conduct."

On January 31, 1952, the mayor appointed Sposito chief of police. This appointment the mayor was not

only authorized to make but was required to make by the mandatory language of the new code: "The Mayor *shall* designate, from the force, the chief and other officers. . . ."

By the new code, authority to appoint a chief of police is transferred from the council to the mayor and is made mandatory. The case of Carey v. Altoona et al., 339 Pa. 541, which held that a third class city might abolish the office of chief of police, is not pertinent here since it arose under the Code of 1931, which had provided:

"The *Council may* designate, from the force, the chief and other officers."

The Supreme Court declared, what was obvious:

"Establishing or maintaining the position of chief of police is not made mandatory, and the council has, therefore, . . . the discretionary power to discontinue that position in the organization of the bureau."

Whether the Code of 1951 was amended to meet the situation which was presented in Carey v. Altoona, it did have just that effect by declaring the duty of the mayor in mandatory terms.

When Sposito was appointed chief he was serving as chief at a salary of $333.38 per month, under ordinance no. 248, enacted December 28, 1950, as amended, which provided, inter alia: "The member appointed to act as chief, two (2) captains . . . shall serve for a period of two years, or until their successors are appointed and qualified."

If we assume that council had the power to reduce the compensation of the chief within the two-year period, it was still required to act in conformity with the amended Code of 1951.

Subsequent to the mayor's designation of a chief, council undertook to nullify the appointment and to reduce the existing compensation by enactment of

ordinance no. 0-1-1952 on February 18, 1952, which established a flat rate of $269.86 for all policemen. The council, apparently, acted under that part of the code which reads:

"The Council shall fix, by ordinance, the number, grades and compensation of the members of the city police force.

"Council shall prescribe all necessary rules and regulations for the organization and government of the police force."

There is a mandate of the legislature which requires the mayor to appoint a chief of police. Council is wholly without power to relieve the mayor of this duty; it is likewise incapable of negativing the authority of the mayor to comply with the legislative direction.

The action of council in establishing a single grade for all policemen was not a compliance with the legislative mandate, especially so since Sposito had been duly appointed chief before enactment of the ordinance no. 0-1-1952. That ordinance did not affect the status of Sposito as the duly appointed chief of police.

The authority of council to prescribe rules and regulations for the organization and government of the police force did not, of course, deprive the mayor of his authority or of his duty to appoint a chief of police. The authority granted to council is to prescribe general regulations for the entire police force. Detailed instructions to individual policemen as to specific matters are to be given by the mayor. These may not be inconsistent with valid regulations enacted by council.

On April 17, 1952, council adopted a motion "That all policemen not in uniform during the next pay period will not be paid, this is according to Ordinance No. 0-1-1952."

That ordinance required that "patrolmen" be attired in uniform when on duty. The motion quoted was subsequent to and contradictory of the mayor's

direction that the chief of police serve in plain clothes. Compliance of Sposito with the requirements of the motion would have required him to ignore the plain provision of the code which directs: "Policemen shall obey the orders of the Mayor and make report to him."

The provision in the same section that "The Mayor shall exercise a constant supervision and control over their conduct" left no authority in council to contradict specific orders of the mayor directed to a particular policeman pertaining to the details of his service.

The situation became acute when Sposito served in plain clothes in compliance with the direction of the mayor and contrary to the terms of the motion which required all policemen to be attired in uniform when on duty. For failure to appear in uniform plaintiff's compensation has been withheld.

We do not hold that council may not require all policemen to serve in uniform. If a regulation prescribed by council so provides, then the Mayor may not override the requirement.

The motion which defendants contend required Sposito to appear in uniform, by its own terms, rests upon ordinance no. 0-1-1952, which applied to *patrolmen*. As above pointed out, Sposito was not a patrolman when the ordinance was enacted.

The schedule attached to the ordinance seems to be an effort to direct and control the services of 18 policemen by ordinance.

The authority of the mayor to appoint a chief of police includes the power to appoint a chief with the powers and duties commonly accorded to the office. Under the guise of regulation, council may not so limit the duties of the office of chief of police as to render it impossible for the mayor to preserve the public peace, etc., as he is required to do by section 12198-1203 of the code. Council may and should supervise the police force by adequate regulations. It may

not, however, assume to itself the prerogative of the office of chief of police.

The difficulties here have arisen because the municipal officers of the city apprehended the extent of the powers of the city and its officers in matters upon which the legislature had spoken. Doubtless it seemed to them that they were better qualified to pass upon what affected the local welfare than the legislators. They appear to have regarded the statutory provisions as recommendations only, to be followed or ignored, according to the judgment of council.

"In Pennsylvania our highest court has said: 'It is a fundamental principle that the authority of a municipal body is to be found in the statute which confers it, and must be exercised strictly in the manner therein provided.' Miners S. Bank v. Duryea Borough, 331 Pa. 458, 462": Kline et al. v. Harrisburg et al., 362 Pa. 438, 450.

A similar matter was before the court in Lesley et al. v. Kite, etc., et al., 192 Pa. 268, where it was held:

"Appellants' contention proceeds upon the erroneous theory that municipal corporations, or the officers thereof, may do anything—not actually forbidden by law—which the caprice of councils or of executive officers may consider to be for the best interests of the municipality. This is a mistake. Nothing is better settled than that a municipal corporation does not possess and cannot exercise any other than the following powers: (1) those granted in express words; (2) those necessarily or fairly implied in or incident to the powers expressly granted; (3) those essential to the declared objects and purposes of the corporation, not simply convenient but indispensable. Any fair, reasonable doubt as to the existence of power is resolved by the courts against its existence in the corporation, and therefore denied."

See also Wentz v. Philadelphia et al., 301 Pa. 261, 271.

Municipalities are not sovereigns: Kline et al. v. Harrisburg et al., 362 Pa. 438, 443.

Bussone v. Blatchford et al., 164 Pa. Superior Ct. 545, 548, declares:

"In McQuillen, Municipal Corporations 2d Ed. Revised Vol. 3, section 949, pages 114, 115, it is said that:

" '. . . Ordinances in conflict with statutes are void, unless expressly authorized. The general rule is that, where there is a state law relating to a subject, an exercise of police power by the municipality thereon must be in conformity with such law.' "

Municipal corporations are agents of the State, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined by the legislature, and subject to change, repeal or total abolition at the will of the legislature. They have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence. This is the universal rule of constitutional law, and in no State has it been more clearly expressed and more uniformly applied than in Pennsylvania.

In Philadelphia v. Fox et al., 64 Pa. 169, the Supreme Court declared:

"The City of Philadelphia is . . . a municipal corporation, that is, a public corporation created by the government for political purposes, and having subordinate and local powers of legislation. . . . It is merely an agency instituted by the sovereign for the purpose of carrying out in detail the objects of government essentially a revocable agency having no vested right to any of its powers or franchises the charter or act of erection (creation?) being in no sense a contract with the state and therefore fully subject to

the control of the legislature, who may enlarge or diminish its territorial extent or its functions, may change or modify its internal arrangement, or destroy its very existence, with the mere breath of arbitrary discretion. . . . The sovereign may continue its corporate existence, and yet assume or resume the appointments of all its officers and agents *into its own hands;* for the power which can create and destroy can modify and change." (Italics supplied.)

The rule upon this subject appears to be that, except where the construction has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operates according to natural justice or not in a particular case: Commonwealth v. Moir, 199 Pa. 534.

Municipal bodies are agencies of the Commonwealth and subject to its legislation, limited only by constitutional provisions: Commonwealth v. Moir, supra; Annexation of Mill Creek Township, Erie County, 74 Pa. Superior Ct. 275; New Castle v. Lawrence County et al., 353 Pa. 175, 183.

The power of the State over its municipal subdivisions is comprehensive and well settled: Commonwealth v. Moir, supra.

The municipality's relations with its employers are therefore subject to State regulations.

"The legislature had the power to make the regulation effective without regard to and in spite of local regulations of the borough": Warren Borough v. Willey, 359 Pa. 144, 146.

Defendants argue:

"Ordinance No. 0-1-1952 did not mention a chief; this ordinance superseded prior ordinances and plaintiff cannot, under any conception whatsoever, be a chief of police in Farrell."

Yet the legislature in section 2002 of the amended code expressly declares: "The Mayor *shall* designate

from the force, the chief and other officers. . . ."

Does not the ordinance presume to ignore this plain legislative mandate?

Defendant says that plaintiff "seeks the rewriting of legislation. It (the mandamus) seeks a substitution of what the court considers proper rules and regulations for those adopted by council with the added request that the court's rules be consistent with what plaintiff desires. It seeks the substitution of a new wage scale for that adopted by council".

We do not so understand plaintiff's claim. It cannot be seriously contended that ordinance no. 0-1-1952, fixing the rank of patrolmen for all 18 of its policemen, at a uniform salary, was a compliance with the injunction of the legislature that "The Council *shall* fix by Ordinance, the number, grades and compensation of the members of the city police force".

This ordinance, enacted after the mayor had designated Sposito chief of police, was ineffective to affect the latter's existing status, on the date of his appointment, to the extent that he became a patrolman subject to the requirement of section 2 of that ordinance that "Patrolmen shall be attired in uniform when on duty".

If the mayor and council will conform to the directions of the statute, a better city administration will be the result.

No one disputes the power of council to fix the compensation of the members of the city police force. No one can excuse council from fixing the grades of the members, as commanded by law.

The integrity of any police force is strengthened by due recognition of the factors of experience and capability, which, it is assumed, is reflected by the grade or rank attained. To offer some assurance that experience and capability will be recognized, the legislature directed council to designate the grades of the members of its police force. Such a requirement has

the endorsement of all citizens who desire an efficient police system. While the number of grades to be designated is left to the council, that body may not wholly ignore the requirement.

Too often municipal officers seem to regard city affairs as their private preserves. To combat such an attitude, the legislature has commanded certain duties, leaving much else to the discretion of municipal officers, consequently it is vital to the welfare of citizens that the mayor and council strictly comply with those requirements which the legislature regarded sufficiently fundamental to be incorporated in the law.

*Conclusions of Law*

1. The mayor's designation of John J. Sposito as chief of police of the City of Farrell was a valid appointment.

2. The city council is without power to revoke that appointment or to reduce the status of Sposito as chief.

3. Ordinance no. 0-1-1952 requiring patrolmen to serve in uniform did not apply to Chief Sposito.

4. By serving in plain clothes Sposito was obeying the order of the mayor, as the law required him to do.

5. Defendants acted without power so to do in withholding the compensation of Sposito.

6. Council may require all police officers to serve in uniform.

7. Council is without power to assume the prerogatives of police or mayor under the guise of rules and regulations governing the police department.

8. Council has the clear duty to fix, by ordinance, the number, grades and compensation of the members of the city police force and to prescribe all necessary rules and regulations for the organization and government of the police force.

9. Ordinance no. 0-1-1952 was ineffective to reduce the compensation of Sposito as fixed by Ordinance no. 248, as amended.

10. Plaintiff John J. Sposito is entitled to receive compensation from the City of Farrell from February 18, 1952, at the rate of $333.38 per month, less credits for any payments for the period heretofore made by the city.

Where a complaint in mandamus is sustained, the court may issue its order commanding defendant to perform specific duties. In the instant case, we believe that the difficulties involved have arisen because of a misapprehension of what the law requires. Because defendants are public officers, we feel justified in assuming that, once the requirements of law have been clarified, there will be neither reluctance nor delay in compliance therewith.

Entertaining these views, we shall not enter an order immediately.