## Commonwealth, Appellant, *v.* Cabell.

514

Argued September 10, 1962.   Before RHODES, P. J., ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ.

*Levy Anderson,* First Deputy City Solicitor, with him *Matthew W. Bullock, Jr.,* Assistant City Solicitor, *James L. Stern,* Deputy City Solicitor, and *David Berger,* City Solicitor, *Arlen Specter,* Assistant District Attorney, *Paul M. Chalfin,* First Assistant Dis-

trict Attorney, and *James C. Crumlish, Jr.,* District Attorney, for Commonwealth, appellant.

*George T. Guarnieri,* for appellee.

*Lewis M. Stevens,* with him *Peter Hearn,* and *William A. Schnader,* for amicus curiae.

OPINION BY FLOOD, J., November 15, 1962:

These are appeals from orders of the court below quashing three indictments. The first charged a conspiracy by the defendants to violate Section 10-108(1) of the Philadelphia Home Rule Charter. The second charged the defendant Cabell with unlawfully making a false statement and mark in a certain test given under a civil service regulation by placing on an examination paper purporting to be his own the examination number of the other defendant Luck. The third charged the defendant Luck with a similar offense.

The charges against the defendants arose out of an agreement by the defendant Luck to pay the defendant Cabell $50 to take a civil service examination for fireman on Luck's behalf. The two exchanged examination numbers so that Cabell's paper appeared to be that of Luck and vice versa. Cabell's paper, which bore Luck's number, achieved a high score and was number one on the eligible list.

Section 10-108(1) of the Philadelphia Home Rule Charter provides: "No person shall make any false statement, certificate, mark, rating or report with regard to any test, certification or appointment made under the civil service regulations or in any manner commit or attempt to commit any fraud preventing the impartial execution of such regulations."

Section 10-109 provides: "A violation of any of the foregoing sections of this article shall be a misdemeanor, punishable by a fine of not more than three

hundred dollars or by imprisonment for not more than ninety days, or both, and if the violator is an officer or employee of the City, by removal from office or immediate dismissal."

The appellees attack the indictments upon the following grounds:

(1) The legislature, in the Enabling Act of April 21, 1949, P. L. 665, §17, 53 PS §13131, did not intend to do more than give the city power to enforce its ordinances by a civil suit for a penalty by way of fine, with the right to enforce payment thereof by imprisonment for failure to do so, and the act should not be construed to authorize the city to create crimes and punish acts so denounced by imprisonment in the first instance.

(2) The city, in its Home Rule Charter, assumes to exercise a power to create a crime which is an exercise of sovereignty and a non-delegable power of the legislature.

(3) The charter provisions, in making fraud in civil service examinations a crime, violate the limitation of §18(c) of the Enabling Act, since there was already in existence a uniform statutory system throughout the Commonwealth for the punishment of civil service cheating in cities.

1. The provisions of §10-109 of the charter, making a violation of §10-108(1) a misdemeanor, is based upon §17 of the Enabling Act, supra, which gives to any city, which takes advantage of the act to frame its own charter, ". . . all powers and authority of local self-government and . . . complete powers of legislation and administration in relation to its municipal functions . . . The charter . . . may provide . . . for the exercise of any and all powers relating to its municipal functions, not inconsistent with the Constitution of the United States or of this Commonwealth, to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class, and with like

effect, and the city may enact ordinances, rules and regulations necessary and proper for carrying into execution the foregoing powers and all other powers vested in the city by the charter it adopts or by this or any other law. Ordinances, rules and regulations adopted under the authority of this act or under the provisions of any charter adopted or amended hereunder shall be enforceable by the imposition of fines, forfeitures and penalties, not exceeding three hundred dollars ($300), and by imprisonment for a period not exceeding ninety days."

Section 10-109 of the charter above quoted, provides for the precise maximum penalty authorized by §17 of the Enabling Act. It is hard to see how it can be successfully argued that the act does not authorize the penalty which the charter imposes. We conclude that §10-109 of the charter is within the authority conferred by §17 of the Enabling Act.

2. The Enabling Act is attacked as delegating legislative power in violation of art. II, §1, of the Constitution which vests all legislative power in the General Assembly. It is argued that the power to create a crime is non-delegable by the legislature, and that, insofar as §17 of the Enabling Act attempts to delegate this power, it is in violation of the Constitution, and the attempt of the city to exercise such delegated power by adopting §10-109 of the charter is without constitutional basis and invalid.

Prior to the Enabling Act of 1949, supra, other acts had given cities the right to enforce their ordinances by imposing fines, with imprisonment upon failure to pay the fine. In reversing an order issuing an injunction against the enforcement of such an ordinance in *Adams v. New Kensington*, 357 Pa. 557, 563-564, 55 A. 2d 392, 395 (1947), the Supreme Court, after discussing the limited jurisdiction of courts of equity to restrain "criminal prosecutions" on the ground that the

statute or ordinance upon which the prosecution is based is unenforceable, went on to discuss the merits of the inquiry whether the police power of the city under the legislative grant was sufficiently broad to justify the penal ordinance there under consideration. The act under examination, The Third Class City Code of June 23, 1931, P. L. 932, art. XXIV, §2403, cl. 54 (now cl. 60), 53 PS §37403, cl. 60, authorized third class cities, for the enforcement of ordinances made by them for the maintenance of the peace, good government, safety and welfare of the city, to inflict penalties not exceeding three hundred dollars for one offense, with imprisonment, not exceeding ninety days, for nonpayment. The court said: "It is at once obvious that this provision constitutes a grant of extremely broad powers, and such 'general welfare clauses' have always been liberally construed to accord to municipalities a wide discretion in the exercise of the police power . . . In Sayre Borough v. Phillips, 148 Pa. 482, 488, 24 A. 76, it was said: 'By the organization of a city or borough within its borders, the state imparts to its creature, the municipality, the powers necessary to the performance of its functions, and to the protection of its citizens in their persons and property. The police power is one of these. Ordinances of cities and boroughs, passed in the legitimate exercise of this power, are therefore valid.' "

3. While the constitutionality of these earlier statutes is not questioned insofar as they grant to municipalities the right to enforce their ordinances by fine, and by imprisonment to enforce payment of the fine, it is contended that they merely authorize the imposition of a civil penalty and do not give the municipalities power to create crimes. It is argued that there is no authority for the grant of the power purported to be exercised in §10-109 of the charter to enforce its provisions by criminal proceedings, with punishment

by imprisonment in the first instance, and if the Enabling Act is construed so as to authorize this, it is in violation of art. II, §1, as an improper delegation of legislative power.

The court below adopted this view upon the authority of *State of Wisconsin ex rel. Keefe v. Schmiege,* 251 Wis. 79, 28 N.W. 2d 345 (1947). This case, however, stands alone. Not only did the cases in all other jurisdictions hold to the contrary before the *Schmiege* decision[1] but the current was in no way deflected by that decision. The cases in all jurisdictions in which the question has reached the appellate courts since the *Schmiege* decision have held, without exception, that the delegation, under proper circumstances, is valid: *Hickinbotham v. Williams,* 227 Ark. 126, 296 S.W. 2d 897 (1956); *Ex parte Borah,* 92 Cal. App. 2d 826, 208 P. 2d 405 (1949); *State ex rel. Allen v. Kelley* (Fla), 50 So. 2d 527 (1951); *Hannah v. State,* 97 Ga. App. 188, 102 S.E. 2d 624 (1958); *State v. Poynter,* 70 Idaho 438, 220 P. 2d 386 (1950); *City of Garden City v. Miller,* 181 Kan. 360, 311 P. 2d 306 (1957); *City of Baltimore v. Stuyvesant Insurance Co.,* 226 Md. 379, 174 A. 2d 153 (1961) (dictum); *City of Muskegon v. Drost,* 353 Mich. 691, 91 N.W. 2d 851 (1958); *State v. Hoben,* 256 Minn. 436, 98 N.W. 2d 813 (1959); *City of St. Louis v. Page* (Mo. App.), 259 S.W. 2d 98 (1953); *State ex rel. Coffin v. McCall,* 58 N.M. 534, 273 P. 2d 642 (1954); *State v. Scoggin,* 236 N.C. 1, 72 S.E. 2d 97 (1952); *City of Columbus v. Barr,* 160 Ohio St. 209, 115 N.E. 2d 391 (1953); *State v. Larson,* 49 Wash. 2d 239, 299 P. 2d 568 (1956).

The Wisconsin court in *Wisconsin ex rel. Keefe v. Schmiege,* supra, relied upon the definition of a crime as an offense against the sovereign, and of a criminal

---

[1] They are collected in the note to this decision in 174 A.L.R. 1343.

action as "one prosecuted by the state against a person charged with a public offence committed in violation of a public law". Without citing any supporting cases (and overruling two earlier cases in the Wisconsin Supreme Court) the court lays down the rule that there can be no delegation of the power to create a crime or the power to inflict imprisonment in the first instance. The only reason it gives for this is that to permit a municipal body to create a crime is to raise it to the dignity of a sovereign. However, a municipality is not like a private corporation to which sovereign power cannot be delegated, except to the limited degree permitted by such statutes as eminent domain laws. A municipal corporation is an agency of the Commonwealth: *New Castle v. Lawrence County,* 353 Pa. 175, 44 A. 2d 589 (1945). Grants of police power to municipal corporations for the maintenance of the peace, good government, safety and welfare of the city are broadly, not narrowly construed: *Adams v. New Kensington,* supra. The municipality may be granted part of the governmental power of the state, so far as its local interests are concerned.

That the penalty here was imposed for a proper municipal purpose—violation of its civil service provisions—is clear from the decisions upholding the civil service provisions of the charter: *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834 (1953), *Addison Case,* 385 Pa. 48, 122 A. 2d 272 (1956).

4.   The court, relying upon *Wisconsin ex rel. Keefe v. Schmiege,* supra, seeks to support the reasoning of that case by suggesting that municipalities lack power to create crimes for three reasons: (1) the necessity of geographical uniformity in criminal legislation, (2) the difficulties which would arise from the fact that the state and a city might both make the same act criminal and subject to different or cumulative penalties, and (3) the burden which a contrary holding would

impose upon the city to observe all the procedural safeguards peculiar to criminal tribunals. Of these objections, the first two raise no question of constitutionality, whatever may be said of them as a matter of policy.[2]

The question as to whether such a delegation requires the city to observe all procedural safeguards peculiar to criminal tribunals need not be decided in this case.[3] Section 10-109 makes the violation of §10-108(1) a misdemeanor. This means that it must be prosecuted by indictment in the Quarter Sessions Court, with all procedural safeguards incidental to a plenary criminal proceeding. Consequently, no valid objection to §10-109 can be taken on this ground.

5. If there had been doubt about the right of the legislature to delegate this power in Pennsylvania, it was set at rest by the adoption of the so-called Home Rule Amendment to the Constitution on November 7, 1922, which added to the original art. XV, §1, the following: "Cities, or cities of any particular class, may be given the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature. Laws also may be enacted affecting the organization and government of cities and boroughs, which shall become effective in any city or borough only when submitted to the electors thereof, and approved by a majority of those voting thereon."

---

[2] As to geographical uniformity, see *People v. Hanrahan*, 75 Mich. 611, 42 N.W. 1124 (1889). As to different or cumulative penalties see *State ex rel. Wilson v. Quigg*, 154 Fla. 348, 17 So. 2d 697 (1944). 6 McQuillin, Municipal Corporations, §§23.10 and 23.12 (3d ed. 1949).

[3] As to this, see *State v. Hoben*, 256 Minn. 436, 98 N.W. 2d 813 (1959).

Under this constitutional amendment the legislature is unequivocally authorized to give cities the right to exercise the powers of local self-government subject to such limitations as it may impose. Local self-government includes the power to legislate as well as to administer, and if it is to be effective it must include the power to provide penalties for violation of its legislative mandate. The legislature was therefore acting within its constitutional power in providing in §17 of the Enabling Act that the city might enforce its ordinances, rules and regulations by fines and by imprisonment.

The argument, implicit in the *Schmiege* decision, that a charter provision, even though authorized both by the legislature and the vote of the electors, is somehow inferior in dignity or power to a statute, was rejected by the following language of Mr. Justice JONES in the *Addison Case,* supra, at p. 57, 122 A. 2d 272, 275: "That the Charter constituted legislation no less than does a statute of the legislature to like end is too plain for even cavil. Whether a municipal charter comes into being by direct statutory grant of the legislature or by adoption by the constituent electorate in the exercise of power constitutionally reposed, it is as much legislative in the one instance as in the other and has equal legal force and standing in both. Indeed, a constitutionally permissible adoption of a municipal charter by the electorate is not one whit less in dignity than a statute of the legislature granting a charter. Where it is adopted by a constitutionally empowered electorate, it affords an example of pure democracy—the sovereign people legislating directly and not by representatives in respect of the organization and administration of their local government. Specifically, therefore, Philadelphia's Home Rule Charter constitutes legislation (i.e., the adoption or enactment of a law by a competent body) just as much as did the City's Charter of

1919 which the legislature itself enacted. Wherefore, upon its due adoption, Philadelphia's Home Rule Charter took on the force and status of a legislative enactment."

We conclude that there was a proper and constitutional delegation of authority to the City of Philadelphia to impose fines and imprisonment for violations of §10-108(1) of the Home Rule Charter and that the authority so delegated was properly exercised in §10-109.

6. The defendants contend that §18(c) of the Enabling Act, prohibiting the city from exercising powers contrary to acts of the General Assembly applicable to all cities in the Commonwealth (53 PS §13133(c)) invalidates §10-109 of the charter because of the penalties imposed on violations of civil service provisions in several other acts. On this point the court below said: "These related acts of the legislature applying to the cities of each class are as follows: Act of June 25, 1919, P. L. 581, Art. XIX, Section 22, 53 PS 12642, applying to cities of the First Class; Act of May 23, 1907, P. L. 206, Section 25, 53 P.S. 23459, applying to cities of the Second Class (this provision would also apply to cities of the Second Class A under Act of June 25, 1895, P. L. 275, Section 2, as amended, 53 PS 103); Act of May 31, 1933, P. L. 1108, Section 14, 53 P.S. 39874, applying to cities of the Third Class. It will be seen from a reading of these provisions that their scope is, in general, broader than that of Section 10-109 of the Philadelphia charter. That the City has by Section 10-108 of the Charter exercised powers contrary to or in limitation of the aforementioned powers granted by Acts of the General Assembly which are applicable to all the cities of the Commonwealth goes without question."

With this we cannot agree. The statutes referred to by the court below are not identical nor do they im-

pose a uniform penalty. Under the Philadelphia legislative charter of 1919 (Act of June 25, 1919, P. L. 581, art. XIX, §22) a person cheating in a civil service examination was subjected to a fine of $50 to $1,000 but no specific provision was made for imprisonment. For the same offense in a second class city, under the Act of May 23, 1907, P. L. 206, §§25-26, 53 PS §§23459-60, a person could be given the same fine and imprisoned up to two years. Under the Act of May 31, 1933, P. L. 1108, §§14-15, 53 PS. §§39874-5, an offender in a third class city could be punished by the same fine and imprisonment up to only one year. Obviously the General Assembly did not consider uniformity necessary in this phase of local government. For the same offense in one city, a defendant could be sent to jail in the first instance, and in another, he could not. The General Assembly itself has thus made it clear and it has no policy of uniformity of criminal legislation in the area of civil service.

It is hard to see how this series of acts, one for each class of city, varying in penalty and concerned with the violation of separate statutes, can be construed as a granted power "[a]pplicable to all the cities of the Commonwealth".

Moreover, §11 of the Enabling Act superseded the act on this subject previously applicable to cities of the first class as to any such city adopting a charter under its provisions: Act of April 21, 1949, P. L. 665, §11, 53 PS §13111.

Chief Justice STERN laid this argument to rest in his opinion in *Lennox v. Clark,* 372 Pa. 355, 378, 93 A. 2d 834, 845 (1953), quoted with approval in the *Addison Case,* 385 Pa. 48, 55, 122 A. 2d 272, 274-275 (1956), both of which considered the civil service features of the Home Rule Charter: "There seems to exist an erroneous impression on the part of the plaintiffs in all these actions regarding section 18 of the Home

Rule Act which forbids the city [Philadelphia] to exercise powers contrary to powers granted by acts of the General Assembly applicable in every part of the Commonwealth or to all the cities of the Commonwealth. It is argued that because plaintiffs perform their respective functions and duties in pursuance of general laws which impose similar or identical duties upon officers holding corresponding positions throughout the Commonwealth, the city is thereby shorn of all power to interfere with them or their employes. Nothing could be further from the truth, it being abundantly clear that the limitations of power referred to in section 18 concern only laws in relation to substantive matters of State-wide concern, such as the health, safety, security and general welfare of all the inhabitants of the State, and not to matters affecting merely the *personnel* and *administration* of the offices local to Philadelphia and which are of no concern to citizens elsewhere. Any other conclusion would reduce the Charter to a mere scrap of paper and make the much heralded grant of Philadelphia home rule an illusion and a nullity."

The orders of the court below are reversed.