American Sunday School Union, Appellant, *v.* City of Philadelphia ; Taylor, Receiver of Taxes ; and William Laughlin et al., constituting the Board of Revision of Taxes.

161   307
169   308
161         307
26 SC ¹256
26 SC ¹260
161         307
e 29 SC ¹ 46
161         307
36 SC   108
36 SC  ²113
36 SC  ¹120

*Taxation—Exemption—Charity—American Sunday School Union.*

A society organized as an institution of purely public charity, and as such exempt from taxation, may, as an aid to the accomplishment of its primary object, carry on business, or use part of its property for a business purpose, which will render such business or such part of its property taxable.

The American Sunday School Union was organized for " the erection and maintenance of Sunday schools, and the publication and circulation of moral and religious publications." It had no capital stock, and divided no profits. It owned a large building fronting on an important business street, where, in addition to the work of its organization, it conducted a book store for profit. The profits thus made were devoted to the charitable work of the society. *Held* that the society was not exempt from taxation on the portion of its property used for commercial purposes.

*Apportionment—Board of Revision—Appeal—Review.*

On a bill in equity to restrain a city from collecting a tax on property owned by a charitable institution, the court will not determine whether the proportions exempt and taxable have been correctly ascertained. Such a question can only be heard on appeal from the decision of the Board of Revision of Taxes.

MR. JUSTICE WILLIAMS filed a dissenting opinion.

Argued April 6, 1894. Appeal, No. 316, Jan. T., 1894, by plaintiff, from decree of C. P. No. 4, Phila. Co., March T., 1892, No. 503, dismissing bill in equity. Before STERRETT, C. J., GREEN, WILLIAMS, MITCHELL and DEAN, JJ. Affirmed.

Bill to restrain collection of tax.

The case was referred to C. W. McKeehan, Esq., as master,

who after reciting the incorporating acts of April 15, 1845, P. L. 454; Feb. 8, 1847, P. L. 71, and March 29, 1855, P. L. 143, found the facts as follows:

" The American Sunday School Union was founded in 1824 by the merging of the Philadelphia Sunday and Adult School Union, founded in 1817, and other smaller organizations of a similar character in different parts of the country. It was chartered, as above set forth, by the commonwealth of Pennsylvania in 1845. The object of the organization, as stated in the charter, is 'to establish and maintain Sunday-schools and to publish and circulate moral and religious publications.' Its affairs are under the direction of a board of officers and thirty-six managers, selected from various evangelical protestant denominations. It is not a stock corporation, issues no shares, declares no dividends to any of its members, and uses all its capital and income for the promotion of the objects stated above as a missionary and benevolent organization. For many years the society issued its publications and sold them to Sunday schools and to the public below the cost of production, in order to bring them within the reach of all. Subsequently, the contributions of the public being insufficient to continue this plan, the managers were compelled to place the publication operations of the society upon a basis that would be self-supporting. This is now the policy of the association, but it is not the aim of the society to make money, and if any profits are realized beyond what is absolutely necessary to maintain the publication operations, the surplus is used in promoting the missionary work and establishing Sunday schools in needy communities, and in the gratuitous distribution of its literature. Sums are often provided to aid in the support of missionaries. The literature which the society provides is of a high moral character, which it aims to place in the hands of the irreligious, and these publications cannot be made, as a rule, with any profit.

" The publications not issued by the society, but sold by it, are so sold in order to aid it in making its business self-supporting. All these publications must have a tendency to promote the moral and religious objects of the society. The society issues special editions of books which they believe to be of high moral value at the actual cost of making the same—and sometimes below that cost—so that they may be distributed widely.

In 1890 it thus furnished several of its publications to each of the military and naval posts, and to all the life-saving stations of the United States, free of charge. These books were furnished to the benevolent friends who desired to make these contributions without charge for the plates, and at the actual cost of printing and binding.

" For two or three years last passed the committee on publication, upon the request of benevolent individuals who agreed to give the funds, has placed a number of its publications in every school organized by the society in a year, at the cost of printing and binding the same. The publication committee sunk the cost of copyright and cost of plates, and thousands of volumes have thus been furnished by the committee on publication to the committee on missions and its missionaries at these prices.

" Among the publications thus furnished are the People's Hymn Book, Index to the Bible, Words of Christian Teachers, Christ and the Scriptures, Our Sixty-six Sacred Books, and, in a previous year, Schaff's Dictionary of the Bible, People's Commentaries on the Gospels, and ten thousand copies of the Bible.

" The society further employs missionaries to establish Sunday schools in communities where none exist, to visit families for religious conversation, and to distribute religious literature, and especially to enlist them in the formation of Sunday schools. The missionaries also furnish each community and school with religious literature, and, in case they cannot pay for said publications, they are donated in whole or in part.

" To aid in sustaining this part of the work the society receives contributions from the benevolent public. The managers receive no compensation for their services, the time devoted by them to the interests of the society being a benevolent gift. Only such officers as are necessary to carry on the business of the society receive compensation for their services. Since the society has been compelled to make the publication operations self-supporting, it has furnished its publications for missionary work to its missionary committee at trade or whole lots of the publications at less than the same are furnished to the trade.

" The society employs over one hundred missionaries on salaries, whose duty it is to visit families, and get them interested in religion, and persuade them to go to church.

" The present building of the society, on Chestnut street above Eleventh, cost about the sum of $71,000. The funds for the purchase of this building were furnished from the sale of the old building, 146 Chestnut street, and from voluntary contributions. The old property at 146 Chestnut street was purchased and built from voluntary contributions given by benevolent persons for the benefit of this charity. The mortgage of $17,000, originally existing on the property 1122 Chestnut street, has been paid off by contributions and legacies.

" The main building on Chestnut street extends the depth of eighty feet, of the full width of said lot, and on the Sansom street end there is a warehouse one hundred feet deep, of the width of the lot, leaving an interval between the buildings of forty-nine feet, which is appropriated for the counting room and offices. This is the first floor of the entire building.

" In the basement there is a cellar, with furnaces for heating, storage room for stereotype plates and fuel. It is also used for the storage of packing boxes, etc.

" The first floor of said building extends from Chestnut street to Sansom street two hundred and twenty-nine feet. The Chestnut street end is devoted to retail and wholesale sales, and the south part towards Sansom street is used for stock in large quantities, kept there for filling orders, and where it is packed and shipped. The center is the counting room and agent's office and bookkeeper's desk, also the treasurer's office and fire-proof for account books.

" On the second floor on Chestnut street the front room is occupied chiefly by the secretary of missions and by the board of officers and managers of the society for their meetings. There are also two offices on the second floor, and a large hall, which is now called the teachers' hall and parlor. These occupy the intermediate space between the Chestnut street and Sansom street buildings. The entire back building on the second floor is used for the storage of library books received from the binders and stored away there. The third floor back is used for the printed sheets as they come in from the printers. As to the third floor on the Chestnut street front, the two back rooms are used by the editors of the books and periodicals of the society. Thus the entire building is used for the purposes of the said corporation, and no part thereof is rented, or is in any sense a source of revenue."

The master recommended a decree in favor of plaintiff, on the authority of Episcopal Academy v. Phila., 150 Pa. 572. Exceptions to the master's report were sustained in an opinion by ARNOLD, J., 3 Dist. R. 139, and a decree entered dismissing the bill.

*Error assigned* was above decree.

*Rowland Evans* and *R. L. Ashhurst*, for appellant.—Gifts for religious purposes are charities ; as for the advancement of Christianity among the infidels, for the dissemination of the gospel, for foreign missions, for distributing Bibles and religious tracts, for the benefit of ministers of the gospel, and for building, ornamenting, or repairing churches : Bisph. Eq. §§ 121, 122, 124 ; Perry on Trusts, § 700 ; Attorney-General v. State, 10 Va. 21 ; Bliss v. Bible Society, 2 Allen, 335 ; Domestic and Foreign Missionary Society's Appeal, 30 Pa. 425 ; Evangelical Association's Ap., 35 Pa. 316 ; Pickering v. Shotwell, 10 Pa. 26.

The essential features of a purely public charity are that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefinite or unrestrained quality that gives it its public character : Donohugh's Ap., 86 Pa. 306.

A charitable institution does not lose its character as a charity, in the purview of the law relating to taxation, by dispensing a part of its charitable work for a pecuniary return sufficient to cover expenses, any occasional excess of receipts over disbursement being applied to the general purposes of the society, so that there is no element of private or corporate gain : Episcopal Academy v. Phila., 150 Pa. 572 ; Donohugh's Ap., 86 Pa. 306 ; Phila. v. Woman's Christian Association, 125 Pa. 582.

*E. Spencer Miller*, assistant city solicitor, *Charles F. Warwick*, city solicitor, with him, for appellee, cited : Donohugh v. Y. M. C. A., 7 W. N. 208 ; Phila. v. Barber, 160 Pa. 123.

OPINION BY Mr. JUSTICE DEAN, April 30, 1894 :

The corporation known as the American Sunday School Union has its principal place of business in the city of Philadelphia. It occupies No. 1122 Chestnut street, the lot fronting on the street thirty-five feet, and extending back to Sansom

street two hundred and thirty-five feet. The building is large and valuable, and covers the whole lot. The society was incorporated by special act of assembly in 1845; its purpose, as declared in the 2d section of the act, is " the erection and maintenance of Sunday schools, and the publication and circulation of moral and religious publications." It is a corporation with no capital stock, declares no dividends and divides no profits; is carried on for benevolent and religious purposes. The Board of Revision of Taxes of the city of Philadelphia rated its property on Chestnut street at $158,000; of this valuation $28,000 was stricken off as exempt from taxation; the remainder, $130,000, was assessed at the city rate, $1.85 per $100, making $2,405 for each of the years 1891 and 1892.

The Sunday School Union, the plaintiff, filed this bill to enjoin the defendant, the Receiver of Taxes, from collecting this assessment, averring that its purpose as disclosed by its charter, and as carried out in the building on 1122 Chestnut street, was that of a purely public charity, and it was therefore exempt from all taxation.

The defendant denies that plaintiff is such charitable institution as is by law exempt from taxation, and avers that the premises described are occupied and used mainly in carrying on the business of manufacturing and selling books and other articles of merchandise.

C. W. McKeehan, Esq., was appointed master, whose finding of facts and conclusions of law, in a very concise and clear report, are with the plaintiff. On exceptions being filed by the city, the learned judge of the court below differed with the master in his legal conclusion from the facts, and dismissed the bill. From this decree plaintiff brings this appeal.

The master finds these material facts, on which he bases his opinion that the society is exempt from taxation:

" For many years the society issued its publications and sold them to Sunday schools and to the public below the cost of production, in order to bring them within the reach of all. Subsequently, the contributions of the public being insufficient to continue this plan, the managers were compelled to place the publication operations of the society upon a basis that would be self-supporting. This is now the policy of the association, but it is not its aim to make money, and if any profits are realized be-

yond what are absolutely necessary to maintain the publication operations, the surplus is used in promoting the missionary work and establishing Sunday schools in needy communities, and in the gratuitous distribution of its literature."

Then, further, he finds, that the first floor of the Chestnut street end of the society's building "is devoted to retail and wholesale sales, and the south part, towards Sansom street, is used for stock in large quantities, kept there for filling orders, and where it is packed and shipped." And further: "In the salesroom on Chestnut street, publications of the society, and publications other than those of the society, are sold at the prices at which they are sold by the other booksellers of the city of Philadelphia. No publications are allowed to be sold which are not of a high moral character, but such standard works as Webster's Dictionary and similar publications are kept by the society, and sold to their regular trade, although as a rule persons asking for standard publications are referred to other booksellers. The publications not issued by the society, but sold by it, are so sold in order to aid it in making its business self-supporting."

The master, on these facts, concluded the society was wholly exempt from taxation ; the court, that it was not. Which was right ?

Conceding the fact that the society is an "institution of purely public charity," and as such exempt from taxation, it seems to us, such an institution may, as an aid to the accomplishment of its primary object, carry on a business, or use part of its property for a business purpose, which renders such business or such part of its property taxable. The first floor of the society's Chestnut street building was used for purely business purposes, and its business was conducted in that location for the avowed purpose of profit. As the master finds, in the first years of the society's operations, it sold its books at less than cost, but finding this plan was not on the whole successful, "the managers were compelled to place the publication operations of the society upon a basis that would be self-supporting." That is, they established and maintain upon one of the most eligible and valuable sites of the city, a book-store for profit. In this they sell, not only the society's own publications, but others. While they confine their trade to "publications of a high moral char-

acter, and such standard works as Webster's Dictionary and like works," this in no way negatives the business character of the enterprise. There are but few reputable booksellers anywhere who would wish a trade in immoral books, or in publications other than meritorious. Nor does the fact that the profits gathered on the counter of the book-store are devoted to the primary object of the charity, which is purely public, in any degree affect the character of the trading or commercial enterprise. Every dollar the society expends is some charitable contributor's gains or profits from some business not charitable; if such contributor devoted the whole of his profits from the sale of dry goods, groceries or books to promote this particular charity, that fact would not make the source of such profit a purely public charity. And if, as the master has found, the society was compelled to put a part of its operations on a basis that was self-supporting, by starting a book-store to sell books only of a high moral character, and standard publications, that is trade. That the entire profits of this branch of the business are devoted to the purposes of the charity, no more changes its business nature than if, instead of a book-store, the society had established and carried on a shoe-store. It might have operated a farm or rolling-mill with the same end in view, to put the society, as the master aptly says, on a basis that was self-supporting; but the end would not have exempted the business from taxation.

It is clear, from the evidence here, that the city did not tax any portion of the funds paid by pious and benevolent contributors; it sought only to collect a tax from that part of the business which was purely commercial. And there is no injustice in this, nor any harshness. The commercial operation occupies thirty-five by two hundred and thirty-five feet of the most valuable ground in the city; its location is peculiarly favorable to the business carried on there. The large municipal expenditures in the past have greatly increased its value; the millions now being expended, and that will be expended in the future, will still further enhance the price of the land, and increase the profits of the business. The taxable property of other dealers and real estate owners in the city can claim no exemption. Why should not this business pay its fair proportion of the taxes necessary to the paving of streets, construction

of sewers, furnishing of light and water, maintaining a fire department, supporting a police force, and other municipal objects? To exempt this book-store from taxation to the amount of $2,405 each year, is in effect a shifting of that much of an individual's burden to the shoulders of the public. If the society does not pay it, the general public must; another individual dealer in the same business must pay his full share of taxation, and then his share of what his rival ought to pay.

Nor is this conclusion a novel one. The Board of Revision of Taxes has, in the case of all other institutions of a like character, for years followed a system of taxation whereby the mercantile part of the business was taxed, and the " purely public charity" part exempted. The Presbyterian Board of Publication is assessed at $260,000, whereof $60,000 is exempted; the American Baptist Publication Society is assessed $225,000 and $20,000 is exempt; the Board of Church Extension of the Methodist Church is assessed at $25,000 and $7,000 is exempt; the Young Men's Christian Association is assessed at $400,000, of which $210,000 is exempt. The Board of Revision of Taxes, in the performance of their manifest duty in these cases, as in the one in hand, seem to have carefully separated that, in each institution, which was a " purely public charity" from that which was commercial in its character, and determined the liability to taxation accordingly.

In all cases of this kind the tendency naturally is to an excessively liberal construction of the constitutional exemption, a construction not warranted, perhaps, by its plain restriction. The people knew what they meant, when in 1874 they said, by an overwhelming majority, " The General Assembly may by general laws exempt from taxation public property used for public purposes, actual places of religious worship, places of burial not used or held for private or corporate profit, and institutions of purely public charity." They meant nothing else should be exempt from taxation. By no judicial rule of construction can these words be made to mean that a commercial enterprise is exempt because the whole profit of it goes into the treasury of, and it is carried on by, a purely public charity. In so far as the institution is charitable, and its revenues are derived from the contributions of the charitable, it is protected by the constitution. But if such institution sees fit to engage

in trade for the purpose of increasing its revenue, or making any part of its business "self-supporting," the trade part of its business can be taxed, and ought to be.

The authorities cited by the learned counsel for appellant, on their facts, are not in conflict with what is here decided. In Donohugh's Appeal, 86 Pa. 306, the opinion is by our brother MITCHELL, then sitting in the common pleas, which on affirmance was adopted as the opinion of this court. The Library Company of Philadelphia claimed exemption, on the ground that it was a "purely public charity." It appeared that the use of the books was without charge to all who used them in the library building; to all members, within certain limitations, who took them away for use; and to all persons for a small compensation, who took them away for use, and gave security for their return. It was held that the privilege of taking away for a small compensation was a mere regulation, and not part of the fundamental law of the corporation; but that even if this privilege was repugnant to the nature of the charity, the privilege would be void, and the public character of the charity was not thereby changed.

In Philadelphia v. Women's Christian Association, 125 Pa. 572, meals and lodging were furnished to all women dependent on their own labor for support; to those able to pay, a small charge was made ; but there was no element of gain or profit, the entire revenue not nearly equaling the expenditure. On the facts it was declared a "purely public charity," because, whatever revenue it received by charges was wholly from the recipients of the institution's bounty; the payment made by no one of the beneficiaries equaling in value the cost of the lodging and meals obtained by her. The case was decided on its special facts, and was rested on Donohugh's Appeal.

In the case of the Episcopal Academy v. Philadelphia, 150 Pa. 565, this court went to the outside limit of liberality in construction of the constitution. The school was founded and endowed by public and private charity; the rates of tuition were adjusted with a view to make the school self-sustaining ; a majority of the pupils paid full rates, a small number half rates, and a still smaller number nothing. It was held to be a purely public charity, because its revenues only made it self-supporting, but it was distinctly intimated that if the revenues

had gone beyond the line of self-support it would not have been exempt. The decision was rested on Donohugh's Appeal and Philadelphia v. Women's Christian Association. We are not required to question the judgments in these cases ; they differ essentially from the one before us in their facts. If the Women's Christian Association had carried on a bakery, meat shop or grocery, that the profits therefrom might make the public charity, the lodging and boarding house, self-supporting, the bakery and meat shop would not have been exempt from taxation ; or if the Episcopal Academy had carried on a coal yard or school book-store in conjunction with their school to make it self-supporting, the coal yard and book-store would not have been exempt. In neither of the cases cited was the business outside of or disassociated from the charity ; in each case it was so blended with the " purely public charity " that on its facts it was difficult to draw a distinction, and the exemption claimed was sustained by this court on the special facts.

But we hold in this case that carrying on a book-store, or any business for profit, subjects such business to taxation, even although the whole profit therefrom goes to the principal institution for purposes of " purely public charity."

As to whether the proportions exempt and taxable have been correctly determined, that is a question with which we, in this proceeding, have nothing to do. Any complaint on that score can only be heard on appeal from the decision of " the Board of Revision of Taxes."

The judgment is affirmed, and the appeal is dismissed at costs of appellant.

### DISSENTING OPINION BY MR. JUSTICE WILLIAMS :

I regret that I am constrained to dissent once more from a judgment-in which a majority of my brethren seem fully to concur. The American Sunday School Union is by common consent a purely public charity. Its work is as wide as our country. It is undenominational in its spirit, its organization, and its methods. It has no stock, and no possibility of personal or corporate gain. It is dependent, from year to year, on voluntary contributions from churches, Sunday schools, and individuals. Whenever the stream of money which now pours from these sources into its treasury shall cease, its beneficent work must be dis-

continued. All this seems to be conceded by this court, and the exemption of the property of the Union from taxation would not be questioned, as we understand, but for the fact that it sells books to those who are willing to pay for them, in addition to giving them to those who are not able to buy. This, it is held, puts the Union in the position of stepping outside its legitimate work and embarking in a business enterprise for profit. What is its legitimate work? It is to send its workers or missionaries along our frontiers and into sparsely settled or destitute neighborhoods wherever they may be found, to gather the young into Sunday schools for moral and religious instruction, and to provide for them a wholesome literature. Many of these books are suitable for the use of adults; and the society seeks to supply the needs of individuals and families by gift where that is necessary, but by a sale whenever a sale is practicable. The price received, whatever it may be, makes a gift to needy persons possible, to the amount so received, beyond what the society could otherwise give. This is their general plan of work.

The building now subjected to taxation has been paid for out of donations made for that purpose. It is the headquarters of the society. The editorial work, correspondence and office work, are done in this building; its publications are stored there; from it shipments are made to its colporteurs, missionaries and agents in every part of the United States. The room fronting on Chestnut street is fitted up as a sales room, and in it the various books and periodicals of the society are offered for sale, together with a few standard books like Webster's Dictionary. This is one of the methods employed to put the publications of the society before the public and so extend their usefulness. This does not seem to me to be the entering upon a new business, but a natural and desirable department of its proper work. It is easy to see that if the Union should open a baker's or a butcher's shop that would be entering upon a new and unrelated business. The fact that the profits made were turned over to charitable work would make no difference. It is not the use to be made of the profits, but the nature of the business done, that is to be considered in deciding upon the question of liability to taxation. The business done by the Union is divisible into two departments, viz.: the organization

of Sunday schools, and household visitations by its missionaries; and the supply of Sunday schools and families with a moral and religious literature. Its missionaries sell the books and periodicals of the society when they can. They give them when this seems to be necessary. Precisely the same thing is done at their building on Chestnut street. They make donations of books and they make sales. The more sales made, the more donations can be made out of the same general stock. The entire profits from sales at their building appear to be about two thousand dollars per annum. This sum should go to increase their gifts to the destitute. By this decision, however, it is subjected to taxation on one hundred and thirty thousand dollars of the valuation of its property. The taxation on this sum at the rate of two per cent, which is not far from the average rate of taxation in this city, will swallow up these profits and take five or six hundred dollars more out of the gifts made by the benevolent to the work of the society. Every dollar thus expended is taken from the destitute who would otherwise be the recipients of it, and the religious and benevolent work of the society is diminished to that extent.

The application of this rule to the Women's Christian Association would subject its property to taxation, for it receives for the food and lodging it provides nearly or quite enough to meet its expenses; but we held that its property was exempt notwithstanding: Phila. v. Women's Christian Association, 125 Pa. 572. Both Lafayette College and the Episcopal Academy received tuition fees from those able to pay, but these institutions were also held to be exempt from taxation. Northampton County v. Lafayette College, 128 Pa. 132; Episcopal Academy v. Philadelphia, 150 Pa. 565.

The great hospitals of this city charge those who are able to pay for their care and treatment, and use the money so received to help sustain the institution; but under the rule laid down in this case it is not easy to see why the hospital that does this should not be taxed. The same basis for taxation exists in both cases. Most of the business done by both is done gratuitously. Some services are rendered by the hospital, some books are furnished by the Union to those who are able and willing to pay for what they get. The money so received helps to pay for services rendered and books furnished to those who cannot

pay, and the capacity of both the hospital and the Union to extend its benefactions is increased correspondingly.

The Young Men's Christian Association building stands on wholly different ground. The first floor of this building was not built for use in the work of the Association, but for rent to merchants, and is in the actual occupancy of tenants who pay rent. The building of the Sunday School Union is occupied wholly with its own appropriate work. It produces no income. The sales of publications made there, whether at a profit, at actual cost, or half cost, are in aid of the gratuitous distribution of the same publications among those who are unable to buy them. I cannot bring myself to doubt that the judgment of the court below should be reversed and this property held to be exempt from all taxation. But if I found myself in doubt I would resolve that doubt in favor of a society devoted to a work of the purest and broadest christian charity. Notwithstanding the wail of a modern poet, christian charity is not a rarity "under the sun," but one of the crowning excellencies of the civilization of our age and country; and the institutions and agencies it has organized for the relief of suffering, and for the moral uplifting of society, should receive the fullest measure of the protection which our constitution and laws provide for them.

I would reverse the judgment appealed from, and grant the relief prayed for.