# The Lutheran Home at Topton, Pennsylvania Tax Appeal.

Argued June 7, 1972, before Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. President Judge BOWMAN did not participate.

*H. Ober Hess*, with him *Benjamin R. Neilson* and *Ballard, Spahr, Andrews & Ingersoll*, for appellant.

*Frederick G. McGavin*, County Solicitor, with him *Leonard J. Gajewski*, Assistant County Solicitor, for appellee.

OPINION BY JUDGE ROGERS, August 3, 1972:

The Lutheran Home at Topton, Pennsylvania, (Home) here appeals from an order of the Court of Common Pleas of Berks County dismissing its appeal from an assessment of part of its properties in that County. The properties in question are dwelling houses located on the Home's campus. The appeals are from the assessment of three such in 1967 and of 25 in 1970. However, there are in fact 36 dwellings on the appellant's property and it is understood that the order finally entered herein will determine the status, whether of exemption or taxability, of all such units under the arrangements described below.

The Home, a nonprofit corporation, contends, and the Board of Assessment and Revision of Berks County concedes, that it is a purely public charity. Its charter purpose declares it to be a charitable and benevolent home providing for poor and destitute children and the aged of both sexes. Its membership consists apparently for the most part of ministers and lay people of the Lutheran Church in America. It maintains a children's home and ambulatory, self-care dormitories and infirmaries for the aged upon clearly charitable terms. Its real estate so used qualifies for exemption from taxation. We are not, however, concerned with these operations or with the properties devoted to them.

In 1962, the Home embarked upon a so-called "cottage program." At a location on its grounds described as being a five minutes' walk from the Administration Building it constructed streets, installed sewage facilities and did what was otherwise necessary to develop a portion of its land in residential building lots. On these lots it erected 36 buildings, of which 28 are single homes, six, duplex dwellings and two, three-unit apartment houses. One of the single homes was described as consisting of living room, dining room, kitchen, two

bedrooms, basement and attached garage. Thirty-six of the residences are occupied by 66 patrons.

These accommodations are available to qualifying persons upon the following terms contained in a written agreement with the occupants in which the following quoted language appears: One of the residents of each unit must be at least 65 years old. Every person seeking occupancy must be in, and have a history of, a condition of health which in the judgment of the Home will fit them for the "cottage plan living." This means that they and each of them must be able to care for themselves in their own home. Each applicant must submit a statement of his financial resources and the Home will accept only persons who can demonstrate that they have sufficient means, in the words of the Superintendent, "to carry on an independent living."

Having met the foregoing requirements; and admission being otherwise approved, the applicant will then be required to pay the Home an admission fee. This fee is in the amount of the basic cost of constructing the residence desired, plus an "intelligent, arbitrary"[1] amount for "ground development" decided upon by the Home. The ground development cost item generally has been $3600. The residence costs incurred and charged occupants since the inception of the program have ranged from $8200 to $20,888.50. The fee is for the dwelling unit, not the person or persons occupying it. The admission fees charged and collected for the 41 occupancies arranged by the time of hearing have been as low as $9000 and as high as $24,488.50, with most being in the $17,000 to $22,000 bracket.

The occupants pay for all utilities and other living expenses. They furnish their residence and such furnishings remain their property. They provide and prepare their food, they have automobiles in which they come and go as they please, they have guests, take vaca-

---

[1] So described by the Home's comptroller.

tions and in all respects live as would any persons of the health and means to occupy their own homes. If they become ill, they must pay for all hospital, nursing, drugs and other expenses of medical or special care required; they may, if necessary, become patients of the Home's infirmary located on the grounds. For the latter they must pay in cash one-half of the usual charge for such care, with the other half charged against the admission fee. If by this process the admission fee is exhausted, ". . . then the entire cost shall be a cash payment of the prevailing monthly charge." They may participate in activities of the Home if they choose and are encouraged to and do perform volunteer work in aid of the infirm residents of group living.

The agreement also provides that "[s]hould cottage residents become physically or financially unable to continue cottage residence, they may become eligible immediately for group living at the Home." If any of the residents should withdraw at any time, the "Home will not be obligated to refund any admission fees . . . ." And, "[u]pon the death of the last survivor, or upon the vacating of the cottage, Home has the right to appraise said cottage and upon receipt of an admission fee from another party, to allow use of cottage to said party."

The testimony of the Home's Superintendent and its Comptroller and its financial statements in evidence revealed the following facts concerning the operation: The cost of development of the lots on which the residences are built was as of the time of hearing $316,000 and the cost of constructing the residences about $543,500, or a total of $859,500. This money came from unrestricted endowment funds. From 1962 through September 1970 the Home had received in admission fees the sum of $756,741.50.[2] The yearly amounts of fees

---

[2] Two of the units, which if rented, would have brought total admission fees of $29,000, were at the time of hearing occupied by employees of the Home.

received by the Home have been: 1962, $13,500; 1963, none; 1964, $67,150; 1965, $27,500; 1966, $101,600; 1967, $36,500; 1968, $120,675; 1969, $215,020; and through September 1970, $174,796.50. One $12,000 residence has been twice occupied and two admissions fees paid.

For the year 1969 the Home's accountants prepared a separate schedule of Income and Expenses for the cottage program, indicating a loss of about $9,000. This showed as the only income a figure of $21,060.75 as earned admissions fees, an amount assertedly equal to five percent of all admissions fees paid as of December 31, 1969. This percentage was thought by the persons concerned with the Home's bookkeeping to be "fair"; but the contractually limited admission age of 65 and the life expectancy of the occupants did not enter into the considerations of those arriving at this figure. On the expense side, $11,096.71 was charged among direct costs as interest, a figure arrived at by multiplying by five percent the end-of-year balance of unrecovered land development cost stated to be $211,000. Other direct costs of the residences, including wages, are listed, totaling about $11,000. About $5800 is charged as general expenses. This is an allocation to the cottage program of general costs of operating the Home. Included in general costs are an item of $3000, an arbitrarily established five percent of the Home's administrative wages, and one of about $2000, a *per capita* allocation against the cottage residents of such Home expenses as utilities, maintenance and repairs, telephone and household supplies used.

The question of whether under the Constitution and statutes of Pennsylvania assertedly charitable institutions or particular portions of such entities' property are entitled to be exempted from local real estate taxes is a mixed one of law and fact. We recognize that the Home in its general work serves a noble purpose. In

the program here under review it has provided a facility useful to persons over the age of 65 physically and financially able to live in their own homes but desirous of residing near a community and under the aegis of persons of kindred moral, religious and age-class interests. But the usefulness of an enterprise is not sufficient basis for its relief from the burden of sharing the essential costs of local government.

The Constitution of 1874, Article 9, §1, authorized the General Assembly to ". . . exempt from taxation . . . institutions of purely public charity. . . ." In pursuance thereof the General Assembly provided, and still provides, exemption for: "(c) All hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence, or charity, including fire and rescue stations, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed, and maintained by public or private charity: Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose. . . ." Section 204 of the Act of May 22, 1933, P. L. 853, as amended, 72 P.S. §5020-204.

Exemption thereby was and remains available only to institutions of purely public charity, which the appellant here is. But the establishment of the status of the institution as a purely public charity is not the end of the inquiry. The property sought to be exempted must be devoted to the charitable use. Nonexempt properties might be those rented by the charity (*Board of Home Missions and Church Extension of the Methodist Episcopal Church v. Philadelphia*, 266 Pa. 405, 109 A. 664 (1920) ; *Christian Assn. of the University of Pennsylvania v. City of Philadelphia*, 75 Pa. Superior Ct. 516 (1921) ) ; or property unused or used for other than

the charitable purpose (*Wynnefield United Presbyterian Church v. City of Philadelphia,* 348 Pa. 252, 35 A. 2d 276 (1944) ; *Albright College Tax Assessment Case,* 213 Pa. Superior Ct. 478, 249 A. 2d 833 (1968) ) ; or property devoted to essentially commercial rather than eleemosynary uses[3] (*American Sunday School Union v. City of Philadelphia,* 161 Pa. 307, 29 A. 26 (1894) ; *Pocono Pines Assembly v. Monroe County,* 29 Pa. Superior Ct. 36 (1905) ; *Dougherty v. Philadelphia,* 314 Pa. 298, 171 A. 583 (1934) ; *Young Men's Christian Assn. of Germantown v. Philadelphia,* 323 Pa. 401, 187 A. 204 (1936) ; *Ivy Hill Cemetery Company's Appeal,* 120 Pa. Superior Ct. 340, 183 A. 84 (1936) ). The principle established by the cases just cited under the Constitution of 1874 was reenforced by amendment adopted April 23, 1968. Article 8, §2(a)(v) of our present Constitution authorizes exemption from taxation for: "Institutions of purely public charity, *but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.*" (Emphasis supplied.) As Judge HANNUM writing for the Superior Court in *Albright College Tax Assessment Case,* 213 Pa. Superior Ct. at 482, 249 A. 2d at 835 (1968), stated: "Although we are guided by the Constitution and the laws thereunder at this date, it is correct and

---

[3] Unless incidental to the principal activities of the institution. *The Contributors to the Pennsylvania Hospital v. The County of Delaware,* 169 Pa. 305, 32 A. 456 (1895) ; *Lycoming House v. Board of Revision of Taxes,* 164 Pa. Superior Ct. 538, 67 A. 2d 646 (1949) ; *Young Men's Christian Ass'n. of Pittsburgh Tax Case,* 383 Pa. 176, 117 A. 2d 743 (1955). *See also* the *Moon Township Appeal* cases, 387 Pa. 144, 127 A. 2d 361 (1956), and 425 Pa. 578, 229 A. 2d 890 (1967), for the kindred standard of reasonable necessity applied in cases in which the issue is whether public property is or is not devoted to public use. *See also Reading Municipal Airport Authority v. Schuylkill Valley School District,* 4 Pa. Commonwealth Ct. 300, 286 A. 2d 5 (1972).

significant to note that the declared intent of the citizens of the Commonwealth of Pennsylvania in the area of tax exemption was to support Constitutional Proposal No. 5, [rewriting Article 9, §1 of the 1874 Constitution] where the limitations imposed on tax exemption are even more strictly defined and prohibit the exemption of property that has only a peripheral relationship to charitable purposes."

We believe that the appellant's residential development as presently conducted falls within the category of cases holding that property of a purely public charity not devoted to its charitable purposes is not entitled to exemption. The following aspects of the appellant's program, in our view, compel that conclusion: (1) That the amount of the admission fee charged is not merely related to but equals the cost of the residence provided; (2) that the admission fee is calculated solely on the cost of the residence, not on the number of persons who will occupy it; (3) that each occupant as a condition to admission must demonstrate that in fact he does not and, in regard to his finances, will not in the future, need help, the provision of which to others qualifies the Home's other properties for exemption; (4) that the written agreement with the occupant does not oblige the Home to admit the cottage resident to its other facilities in the event of physical or financial inability to continue independent living; (5) that the admission fee is neither refundable nor good for credit against any other charge made by the Home, except infirmary care, even should the occupant be admitted to the Home. While the Superintendent testified that he and other admission personnel, with the knowledge of the Board, have assured applicants that they would be admitted to the Home's other facilities if the need should arise, the written agreement provides only that such admission "may" occur. The Home argues that its oral assurances, and the fact that in one case residents of a cot-

tage were admitted to group living, justify the assumption that this would be the Home's practice. This argument not only overlooks the Superintendent's further testimony that the written agreement represents Board policy with respect to the occupancy of these residential units but would also have us view the matter from a wrong legal perspective. The claimant for an exemption must bring himself clearly within the statutes. *Ogontz School Tax Exemption Case*, 361 Pa. 284, 65 A. 2d 150 (1949) ; *Wynnefield United Presbyterian Church v. City of Philadelphia, supra; Longvue Disposal Corp. v. Board of Property Assessment, Appeals and Review*, 375 Pa. 35, 99 A. 2d 464 (1953).

The Home relies heavily upon *Presbyterian Homes Tax Exemption Case*, 428 Pa. 145, 236 A. 2d 776 (1968). There it was held that a home admitting persons at least 65 years of age under plans, one of which presupposed that the applicant had sufficient means of self-support and would pay his way for life, another of which provided for the payment to the home of all of the applicant's assets in consideration of lifetime care, and a third of which required the payment to the home only of old-age assistance grants, was under the facts entitled to exemption. That case is clear and conclusive authority for the exemption of the instant appellant's real property devoted to dormitory and infirmary care of the aged. It is not authority for the exemption of the residential units with which we are here concerned, the occupants of which pay as an admission fee an amount equal to the cost of their residence's construction and receive the privilege of residing there only so long as they are physically and financially able to care for and support themselves independently, and who upon leaving for any reason are entitled as a matter of right neither to refund of any part of their admission fee nor care in the other facilities maintained by the

Home. Mr. Chief Justice BENJAMIN R. JONES' observation that the tuition paying students of the Pittsburgh Aeronautic Institute[4] would not consider themselves objects of charity fits precisely the circumstances here. The cottage residents here who have first been required to prove that they do not need the Home's bounty and second to pay a nonrefundable three quarters of a million dollars for the privilege of occupying cottages during their continued physical and financial self-sufficiency would hardly think of themselves as objects of the Home's charity.

The appellee has directed our attention to *The Presbyterian Homes of the Synod of New Jersey v. Division of Tax Appeals,* 55 N.J. 275, 261 A. 2d 143 (1970), where the Supreme Court of New Jersey denied tax-exempt status on facts much similar to those here. The following from that case seems to us wholly appropriate and clearly applicable to the matter before us:

"First, nothing in the articles of incorporation, the bylaws or the residence agreement obligates petitioner to care for persons who become either financially unable to meet their monthly charges or unmanageable because of illness. On the contrary, petitioner has expressly reserved the right under such circumstances to terminate the residence agreement.

"Second, if the agreement is terminated for reasons other than death, petitioner may then return residents to their families or place them in some other institution. Yet, a resident may well have expended all his assets in payment of the founder's fee. Since petitioner would only be obligated to refund a portion of the founder's fee at most, the State might then be required to care for such individuals during their declining years when their expenses are greatest.

---

[4] *Pittsburgh Institute of Aeronautics Tax Exemption Case,* 435 Pa. 618, 629, 258 A. 2d 850, 853 (1969).

"Third, the amount and nature of the fees and rentals which petitioner requires the elderly residents to pay negates a 'charitable purpose'. . . .

" 'While charging fees would not necessarily remove plaintiff from the category of a charitable institution * * *, the fact that it allocates living space from the standpoint of desirability of location and size on the basis of the amount of the Founder's fees and monthly charges paid by a resident seems to us lacking in the warmth and spontaneity indicative of charitable impulse. Rather, it seems more related to the bargaining of the commercial market place. . . .'

"Notwithstanding the above, petitioner argues that the care of the aged, whether rich or poor, is a 'charitable work' and, therefore, property used in carrying out such work is 'used actually and exclusively for charitable purposes.' The basic deficiency in petitioner's argument, however, is that the residents of Meadow Lakes have purchased that which they are receiving; *quid pro quo* permeates the entire operation. If petitioner's position is sound, then persons of advanced age could simply avoid property taxes by pooling assets in corporate form of their mutual benefit." 261 A. 2d at 149.

We have carefully reviewed this record. We agree with the court below that The Lutheran Home at Topton has failed to establish its right that the residential properties for which admission fees have been paid under the arrangements here described should be exempt from local taxation.

Order affirmed. Appellant to pay the costs.

---

DISSENTING OPINION BY JUDGE WILKINSON:

I respectfully dissent. The able majority opinion clearly and accurately presents both the facts of this case and the statutory and case law in Pennsylvania which applies to it. In my judgment, the opinion sup-

ports tax exemption for the appellant rather than denies it. I cannot agree that this cottage program was not conceived and is not administered as an integral part of the admitted charitable purposes of appellant.