**In Re: Appeal of Eastern Mennonite Home of the Franconia Districts v. Board of Assessment Appeals of Montgomery County**

*Robert G. Bricker*, for plaintiff.
*R. Stephen Barrett*, for Montgomery County.
*Albert L. Foster*, for Board of Assessment Appeals.

YOHN, *J.*, January 23, 1984—The Eastern Mennonite Home of Franconia Districts, Souderton, Pa. (hereinafter the Home) is appealing a decision of the Montgomery County Board of Assessment Appeals (hereinafter the board). The assessed property is located at 207 West Summit Street, Souderton, Franconia Township, Montgomery County, Pa., identified as Tax Parcel No. 34-00-04708-50-5. The entire Home consists of a complex of facilities, including skilled care units, rooms, residential apartments and residential cottages. The subject of this appeal is only the section denominated as "the cottages," which consists of five quadruplex units plus two single family residences.

On June 9, 1980, the board issued a notice to the appellant, assessing the aforementioned tax parcel of 22 dwelling units in the amount of $114,500 for county, local and school tax purposes. On or about July 2, 1980, appellant filed an appeal with the board requesting that the assessed property be found exempt from taxation as an institution of purely public or private charity. A hearing was held on September 5, 1980; and on September 17, 1980, the board issued a decision finding the assessment to be proper.

On October 8, 1980, appellant appealed the board's decision, claiming: (1) the property is used for purely public charity in that it provides a home for elderly and retired persons, and (2) the institution which owns and operates the property is founded, endowed and maintained by public and private charity and the entire revenue derived by the institution is applied to its support and charitable purposes. It is the opinion of this court that the assessed property is not entitled to a real estate tax exemption under the applicable law.

## FINDINGS OF FACT

1. Appellant, the Eastern Mennonite Home of Franconia Districts, with offices at 207 West Summit Street, Souderton, Montgomery County, Pa., is a non-profit corporation existing under the laws of the Commonwealth of Pennsylvania.

2. Appellant was incorporated on July 1, 1916, and has operated a home for the elderly since that time.

3. Appellant is the owner of a 15 acre tract of land located in Franconia Township, Montgomery County, Pa.

4. Situated on appellant's tract is the Eastern Mennonite Home consisting of a skilled nursing facility with 58 beds, 89 individual rooms for retired persons, 38 apartments and 22 cottage-type residences for independent living, along with related dining, laundry, social and recreational facilities.

5. The subject of this appeal is the section of the Home denominated as the cottages, consisting of five quadruplex units plus two single family residences, identified as Tax Parcel no. 34-00-04708-50-5. The single family residences consist of a building known as the "Hackman House" plus a single residence adjacent to the Home's other property. Some of these units have more than one person in occupancy and the total occupancy is approximately 30-35 persons.

6. On or about June 9, 1980, the Board of Assessment Appeals for Montgomery County issued an assessment notice to the appellant for Tax Parcel no. 34-00-04708-50-5 assessing the tract in the amount of $114,500 for county, local and school tax purposes.

7. In 1973, the Home purchased 5.3 acres of ground adjacent to its then existing land. In 1976,

the Home commenced construction of the first quadruplex on the 5.3 acre tract.

8. Between 1976 and 1983 quadruplexes were constructed by the Home at the following estimated costs:

| Unit 1. | $125,000. |
| 2. | $125,000. |
| 3. | $171,000. |
| 4. | $166,000. |
| 5. | $180,000. |

The Hackman House was constructed at a cost of $21,717 and donated to the Home; the final residence was acquired by the Home at a cost of $59,979.

9. The quadruplex units were not built until there were a sufficient number of signed-up prospective tenants to fully occupy the units and a deposit had been paid by the tenants.

10. Prospective residents became aware of the projects by word of mouth and limited distribution of notices within the church community. There has not been public advertisement of the projects.

11. The quadruplex residents were required to pay an entrance fee and an interest-free loan to the Home. For the first quadruplex, residents were required to pay an entrance fee of $15,000 per unit and a $15,000 loan per unit. All of the residents paid the requisite amounts, therefore, the total proceeds received by the Home amounted to $120,000 with the construction costs being $125,000.

12. The fees and proceeds from the second quadruplex were the same as those for the first quadruplex; therefore, the total proceeds received by the Home amounted to $120,000 with the construction costs being $125,000.

13. For the third quadruplex the Home required the residents to pay an entrance fee in the amount

of $17,000 per unit and an interest-free loan in the amount of $17,000 per unit. The total amount of entrance fees and loans received by the Home with respect to the third quadruplex was $136,000 with the construction costs being $171,000.

14. The fees and proceeds from the fourth quadruplex were the same as those from the third quadruplex; therefore, the total receipts equaled $136,000 with the construction costs being $166,000.

15. For the fifth quadruplex the Home required the resident to pay an entrance fee of $19,000 per unit and an interest-free loan in the amount of $19,000 per unit for three of the units. The remaining unit required an entrance fee of $24,000 and an interest-free loan of $24,000. The total amount of fees and loans were $162,000. Constructions costs were $180,000.

16. Currently the Home charges an entrance fee of $44,000 for a three-room unit and a fee of $50,000 for a four-room unit. An interest-free loan is no longer required, but the Home agrees to return one-half of the entrance fee upon termination of the agreement.

17. Entrance fees are deposited in the general fund of the organization and refunds of entrance fees will be paid from the general fund.

18. No funds have been specifically set aside for the possibility of a refund payment nor have any such refunds ever been made. If occupancy is terminated within three years of the initial occupying date, there is a partial refund of the entrance fee reduced by 1 percent per month as an occupancy charge and another 1 percent per month for administration and overhead charges.

19. Upon termination of the agreement with the original tenant, the new tenant would be required to pay the then-existing entrance fee.

20. Pursuant to paragraph No. 4 of the Resident Cottage Agreement, a resident pays to the Home a monthly charge which may be adjusted unilaterally by the Home at will. Paragraph No. 3(b) of the agreement reserves to the Home the unilateral right to terminate the agreement for any cause which, in the judgment of the Home, is sufficient. A breach of payment constitutes such cause.

21. The Home currently charges a monthly fee of $255 for a three-room unit and $300 for a four-room unit. The monthly charge includes water, heat and exterior maintenance of the unit. The resident pays for electricity, air conditioning, telephone services and furnishings for the unit. The resident also pays for all meals taken at the Home's dining facilities and for all medical care, if any.

22. Item No. 22 of the application for admission requests the applicant to state that his personal funds are sufficient to pay for the charges and to designate the length of time this sufficiency will exist.

23. Paragraph No. 5 of the agreement states that in the event a resident is financially unable to meet the monthly charges, the resident will liquidate capital assets to pay the obligations. Paragraph No. 5 further provides for the possibility of subsidization by the Home if the resident's other sources of income are insufficient.

24. Since the cottages have been in operation no cottage resident has ever been unable to pay his monthly charges on a current basis nor has the Home ever subsidized a cottage resident.

25. Some residents of the skilled care and other residential facilities are subsidized by the Home but

there have been no financial concessions to any of the residents of the cottages other than to defer the time of payment of the initial entrance fee for a limited period of time.

26. There is no entrance fee for the skilled care units, rooms and residential apartments.

27. The benefits to cottage residents from the balance of the facility are: the availability of a cleaning service, the ability to take meals at the main facility upon payment of an extra charge, preference with respect to transfer to other facilities of the Home and participation in the social, recreational and religious activities of the Home.

28. The Admission Policy of the Home establishes a priority system giving preference in the following order:

1. Residents of the Home's Residential Unit, Independent-Living Apartments, or Skilled Nursing Unit.

2. Mennonite ministers, their wives and widows.

3. Members of the Franconia Mennonite Conference.

4. Members of the Mennonite faith.

5. All other applicants.

29. The tenancy rate has been close to 100 percent and there have been only three turnovers since the first cottage was occupied in 1976. At the time of the hearing there was one vacancy with a waiting list of three prospective occupiers.

30. Of the present residents of the cottages, 97 percent are of the Mennonite faith.

31. The probability that an individual in the "all other applicants" category will be admitted to the cottage program is low considering the priorities for admission, the low turnover rate and the lack of plans to construct more cottage facilities.

32. The cottages have experienced an operating deficit in each year if depreciation is included as an expense but show a cash surplus if depreciation is excluded. Funds generated by the cottages in excess of expenses incurred are commingled with the funds of the Home and are used for total institutional purposes.

33. An examination of the cottage program reveals a profitable operation, no subsidies from the Home and never a single occasion on which a resident has not made full payment of his or her obligations.

## DISCUSSION

Article 8, §2(a) of the Pennsylvania Constitution provides that:

"The General Assembly may by law exempt from taxation:

(V) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually regularly used for the purposes of the institution."

Pursuant to §2(a) of the Constitution, the General Assembly enacted the General County Assessment Law,[1] which confers an exemption on:

"[a]ll hospitals, universities, colleges, seminaries, academies, associations and institutions of learning, benevolence or charity, including fire and rescue stations, with grounds thereto annexed and necessary for the occupancy and enjoyment of the same, founded, endowed and maintained by public or private charity; provided that the entire revenue derived from the same be applied to the support and to

---

1. Act of May 22, 1933, P.L. 853, Article II, §204(a)(3), as amended, 72 P.S. §5020-204 (a) (3).

increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose."

The burden of proving that the property in question qualifies for a charitable tax exemption lies with the appellant. Presbyterian-University of Pennsylvania Medical Center v. Board of Revision of Taxes, 24 Pa. Commw. 461, 357 A.2d 696 (1976); Appeal of The Eastern District Conference of the General Conference Mennonite Church[2], 72 Pa. Commw. 96, 455 A.2d 1274 (1983). The appellant must demonstrate that the entire institution: (1) is one of "purely public charity"; (2) was founded by public or private charity; and (3) is maintained by public or private charity. Woods School Tax Exemption Case, 406 Pa. 579, 584, 178 A.2d 600, 602 (1962). Implicit in the Woods School analysis is the determination that the property in question be devoted to a charitable use.

Appellant asserts that the cottages are an integral part of the Mennonite Home, a recognized charitable institution, and therefore should not be separately assessed. Appellant cites Lutheran Social Services Tax Exemption Case, 26 Pa. Commw. 580, 364 A.2d 982 (1976) and Appeal of Calvary Fellowship Homes, Inc., 43 Pa. Commw. 485, 403 A.2d 150 (1979) as support for the proposition that the entire facility should be considered in determining tax-exempt status. However, the validity of the Lutheran Social Services line of cases is suspect due to the Pennsylvania Supreme Court's decision in Appeal of Marple Newton School District[3], 500

---

2. Hereinafter cited as "Eastern District Conference."

3. Marple Newtown is commonly referred to as the "Dunwoody case."

Pa. 160, 455 A.2d 98 (1982). Indeed, the Commonwealth Court has stated:

"These cases [Lutheran Social Services and Appeal of Calvary Fellowship Homes], however, can no longer be said to be the law, for our decision in Marple Newtown has recently been reversed by the Supreme Court, Appeal of Marple Newtown School District, [500 Pa. 160], 455 A.2d 98 (1982). We believe, therefore, that Lutheran Homes and its progeny have been overruled sub silencio." Eastern District Conference, 72 Pa. Commw. at 100, 455 A.2d at 1276.

In Marple Newtown, the Supreme Court denied a tax exemption to the "Dunwoody Village," a retirement community owned and operated by the "Dunwoody Home," a charitable institution. The Commonwealth Court applied the Marple Newtown rationale to deny a tax exemption in Eastern District Conference for cottages located on the same tract of land as the Frederick Mennonite Home, a nursing facility founded by charity. Similarly, the court in Lutheran Home at Topton, Pa., 6 Pa. Commw. 199, 293 A.2d 888 (1972), rejected a tax exemption claim for houses located on the Home's property, despite the court's concession that the Home itself was a "purely public charity." The import of these cases is that the cottages here at issue must withstand scrutiny; mere association with or physical proximity to a charitable institution is insufficient to justify a tax exemption claim.

Appellant contends that any funds generated by the cottages in excess of expenses incurred are commingled with the funds of the Home and are used for total institutional purposes. While the aims and purposes of the Home are laudatory, the disposition of the excess cottage funds does not change the tax status of the cottages. Commercial enter-

prise does not become a charitable institution exempt from taxation merely because its earnings are devoted to charity. YMCA of Germantown v. City of Philadelphia, 323 Pa. 401, 187 A. 204 (1936).

The right to a tax exemption is a mixed question of law and fact and must be decided on the circumstances of each case. Appeal of Doctors' Hospital, 51 Pa. Commw. 31, 414 A.2d 134 (1980). Appellant's entire program must be examined, including: the terms of the resident cottage agreement, the requisite entry fees and monthly charges, and the likelihood of subsidization by the Home. Marple Newtown, 500 Pa. at 163, 455 A.2d at 99-100; Lutheran Home at Topton, 6 Pa. Commw. at 207, 293 A.2d at 892-893. The facts must indicate a use commensurate with an eleemosynary purpose. As the Supreme Court stated: "What is 'given' must be more nearly gratuitous than for a price which impresses one as being proportionate to the services rendered." Ogontz School Tax Exemption Case, 361 Pa. 284, 294, 65 A.2d 150, 154 (1949).

The Home required a quadruplex resident to pay an entrance fee and an interest-fee loan, in equal amounts, ranging from $15,000 for the first quadruplex unit to $24,000 for the last of the units. The proceeds from the entrance fees and loans covered a substantial (87.5 percent) portion of the construction costs of the quadruplex units.[4]

It is apparent that any lodging expenses incurred are borne by the resident. The Home charges a

---

4. Total receipts from the quadruplex units equaled $675,000; total construction costs were $767,000. See Findings of Fact Nos. 8, 11-16. If the purchase price of the land is included, the portion of costs covered by resident payments is 84 percent.

monthly fee akin to rent which pays for water, heat and exterior maintenance of the unit. The resident pays for electricity, air conditioning, furnishings for the unit, meals and all medical care. These financial arrangements are virtually identical to those present in Eastern District Conference, 72 Pa. Commw. at 98, 455 A.2d at 1275.

The terms of the resident cottage agreement in addition to the adduced testimony indicate that only those persons who demonstrate an ability to afford the applicable fees are considered for residence. Item No. 22 of the application for admission requires the applicant to state whether his personal funds are sufficient to pay for the charges. The application also asks the resident to list all sources of income. Furthermore, the administrator of the Home testified that no policy exists with respect to those applicants who cannot afford the entrance fees, since the cottages were built as requested by those able to pay the entrance fees.

While the residence agreement does provide for subsidization by the Home, to date no resident has defaulted on his financial obligation and the Home has never subsidized a cottage resident. The possibility of subsidization is remote considering that only those persons financially able to meet the requisite fees and expenses are admitted. Additionally, the Home retains the right to unilaterally remove a resident from a cottage (but not the Home itself) for financial reasons. These factors place the instant case squarely within the ambit of Marple Newtown and Eastern District Conference.

The record indicates that the cottages are not maintained by charity nor is the property devoted to a charitable use. "The basic deficiency in petitioner's argument, however, is that the residents of [the assessed property] have purchased that which they

are receiving; *quid pro quo* permeates the entire operation." Lutheran Homes at Topton, Pa., 6 Pa. Commw. at 210, 293 A.2d at 894. The fact that the Home has been receiving a positive cash flow from the operation of the cottages reinforces this court's conclusion.[5]

Since the residential cottages are not founded or maintained by charity, the appellant should not be granted a real estate tax exemption.[6] This court concurs with the Commonwealth Court's declaration that "We do not mean by this opinion to intimate any disapproval of the appellant's operation of the cottages, but we must hold that it is not a purely public charity, founded and maintained by charity. It follows, therefore, that the appellant must carry its share of the tax burden, as would any commercial enterprise." Eastern District Conference, 72 Pa. Commw. at 101, 455 A.2d at 1276.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the cause of action.

2. The premises located at 207 West Summit Street, Souderton, Montgomery County, Pa., identified as Tax Parcel no. 34-00-04708-50-5 are not "founded, endowed and maintained" by charity within the meaning of the General County Assess-

5. For the fiscal year 1982, income from the cottages was $64,070 against operating expenses of $54,876.13 (including depreciation expense of $16,560).

6. Since the cottages are not founded or maintained by charity, this court need not reach the issue of whether the Home is a "purely public" charity as discussed in West Allegheny Hospital v. Board of Property Assessment of Allegheny County, 500 Pa. 236, 455 A.2d 1170 (1982).

ment Law, Act of May 22, 1933, P.L. 853, 72 P.S. §5020-204 and applicable case law.

3. The premises located at 207 West Summit Street, Souderton, Montgomery County, Pa., identified as Tax Parcel no. 34-00-04708-50-5, are not entitled to an exemption from local real property taxes under the laws of the Commonwealth of Pennsylvania.

## DECREE NISI

And now, this January 20, 1984, the decision of the Montgomery County Board of Assessment Appeals denying appellant's appeal for assessment review and application for exemption from local real property taxes for property identified as Parcel no. 34-00-04708-50-5 is affirmed; and appellant's appeal from said decision is hereby dismissed.

Pursuant to Pa. R.C.P. 227.4, if no motion for post-trial relief is filed within ten days from the notice of the filing of this adjudication and decree nisi, the decree nisi shall be entered by the prothonotary, upon praecipe, as the final decree of the court.