Moon Township Appeal.
Moon Schools Union School District Appeal.
Thrift Drug Company Appeal.

Argued March 22, 1967. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Bresci R. P. Leonard*, with him *Royston, Robb, Leonard, Edgecombe, Miller & Shorall*, for appellants.

*Leonard Boreman*, with him *Jerome M. Libenson*, and *Baskin, Boreman, Sachs & Craig*, for appellee.

OPINION BY MR. JUSTICE EAGEN, May 24, 1967:

The question posed by these appeals is the taxability of certain portions of the Greater Pittsburgh Airport. Specifically involved are: (1) a hotel containing sixty-two rooms and three dormitories; (2) a restaurant, known as "The Fountain Room"; (3) a drugstore; and, (4) a newsstand. These facilities are all located in the airport terminal building. The airport is owned and controlled by the County of Allegheny, and the facilities involved are operated by concessionaires who by the terms of their concession agreements

are liable to the county for the payment of all real estate taxes due and payable thereon.

The Board of Property Assessment, Appeals, and Review of Allegheny County in fixing assessments for the triennial, 1958-1960, intertriennial of 1960, and for the triennial 1961-1963, ruled that the particular facilities were subject to assessment and taxation.[1] The county filed appeals in the Court of Common Pleas of Allegheny County and the concessionaires, the Township of Moon (wherein the airport is located) and the Moon Schools Union School District, were permitted to intervene. After hearing, wherein testimony was introduced by the concessionaires only,[2] the court below entered extensive findings of fact and concluded therefrom that the hotel, restaurant, newsstand, and that portion of the drugstore utilized for the sale of food were tax exempt. These appeals followed. The appellants, township and school district, contend that the court erred in declaring any of the facilities tax exempt. The appellant, Thrift Drug Company, maintains the entire drugstore premises should have been placed in the tax free status.

The pertinent law was explicated in *Moon Township Appeal,* 387 Pa. 144 at 148-149, wherein Mr. Chief

---

[1] This ruling was bottomed upon our decision in *Moon Township Appeal*, 387 Pa. 144, 127 A. 2d 361 (1956), wherein we affirmed the action of the lower court in holding that the same facilities now involved (with the exception of the restaurant which was built in 1960) were subject to assessment and taxation for the year 1953. It should be noted that our ruling therein was in large part influenced by the findings of fact in the court below. Additionally, the order in that case did not extend to subsequent triennials. See *Moon Township Appeal*, 397 Pa. 498, 156 A. 2d 323 (1959).

[2] However, it was stipulated that the court could consider, as part of the record in this case, all findings of fact made in the 1953 assessment case which were not in conflict with the instant record.

Justice STERN, speaking for the Court, stated: "The legal principles applicable to the situation are entirely clear. Article IX, Section 1, of the Constitution permits the General Assembly to exempt from taxation public property *used for public purposes.* Undoubtedly the portions of the Airport employed in its actual operation—the landing fields, runways, ramps, hangars, ticket offices, waiting rooms for passengers, management offices, control tower, repair shops and the like—represent a public use which properly exempts them from taxation; this is conceded by all the parties. There is likewise no question but that property the use of which is *reasonably necessary* for the efficient operation of the Airport, even though not indispensable or essential thereto, is also entitled to exemption. Nor can such property be denied exemption merely because it is rented out by the Airport and thereby yields a return which serves to reduce expenses, because, where the primary and principal use to which property is put is public, the mere fact that an income is incidentally derived from it does not affect its character as property devoted to a public use: [Citations]. On the other hand, however, there is equally no doubt but that property, even though owned by a body ordinarily tax exempt, is taxable if used by it for commercial purposes, or if rented to a lessee for a purely business enterprise and not a public use; this is true even though the rentals or other proceeds from the property are devoted to the tax exempt activities of the lessor: [Citations]." (Original emphasis.)

While the law is clear, its application to the facts is difficult. The line of demarcation between what is "reasonably necessary for the efficient operation of the Airport" and that which serves only the convenience of the traveling public is not easily fixed. However, after studying the record and the findings of fact of the court below which are amply supported by the testimony, we will affirm the lower court's order.

The Greater Pittsburgh Airport is one of the largest and most modern in the United States. Since 1953, its proportions and service have grown phenomenally. From 1954 to 1963, the value of its fixed assets increased from $20,273,789 to $30,798,732. The land coverage expanded from 1500 to 2600 acres. The total number of persons using the terminal building facilities, fixed at 4,000,190 in 1954, increased to 6,974,045 in 1963. The passenger volume and total airplane operations have likewise increased substantially during the period. The facilities required to meet the needs of today's traveling public are a far cry from early days of commercial air transportation, and the Greater Pittsburgh Airport has undoubtedly tried to keep up with the demands of the times. It has provided everything necessary to make it an efficient operation and this has contributed to its expansion and improved service. Under all of the circumstances, we cannot say as a matter of law that the lower court erred in its conclusion that the hotel, restaurant, newsstand and the drugstore food bar are "reasonably necessary" for its efficient operation.

While we will not delve into a detailed discussion of each particular facility here concerned, we will refer briefly to the hotel.

This facility is required under the concession agreement to remain open twenty-four hours a day. It is common knowledge that air travelers are frequently unexpectedly stranded at this and other airports overnight due to inclement weather and other airflight difficulties.[3] The testimony discloses that in many instances these are children or people who are ill and disabled. The instant hotel is not only there on the spot but is connected with the terminal's interconnecting communication system which keeps "the strangers

---

[3] It is uncontradicted that airports in most large cities have similar hotel accommodations to meet such emergencies.

in the night" in touch with the delays and rescheduling of flights. Its occupancy has never gone below ninety per cent for any year since it has been open. Ninety-nine per cent of its guests are from out of town; a large number of airplane personnel use its facilities. In short, it provides a much needed, if not an absolutely required, service.

Moreover, while it is operated by a concessionaire, under the agreement the airport authorities control the prices charged; the hours of operation and the conduct and service of the employed personnel towards the traveling public. The concession contract is also subject to any conditions included in any agreements entered into by the airport authorities under the Federal Airport Act.

It is also noteworthy that the trial court experienced difficulty in the 1953 assessment case in determining if the hotel were tax exempt, and in the course of its adjudication stated, "the . . . hotel comes closer to the line of necessity . . . ." It is clear that in that instance the trial court concluded the hotel did not fall into the necessity category, solely because other hotel facilities existed in the airport area. This same argument is advanced here, but is not persuasive. There is a vast difference between the operation of and service provided by the hotel involved, and other independently operated hotels located off the airport property. Nearness to the airport, while important, is only one of the salient factors.

Finally, we find no error in the lower court's ruling excluding the testimony of one expert witness; or its conclusion that the drugstore area utilized for the sale of drugs, gifts, novelties and other miscellaneous items was not tax exempt.

Order affirmed.

Mr. Justice COHEN and Mr. Justice ROBERTS dissent only with respect to that part of the decision declaring the hotel to be tax exempt.