# Appeal From the Decision of the Board of Property Assessment, Appeals Review and Registry Regarding Pittsburgh International Airport Tax Exemptions

354

C.P. of Allegheny County, no. 99-500.

*Stanley J. Parker,* for appellant.
*Craig C. Stephens,* for appellee.
*Ira Weiss,* for interested party West Allegheny School District.
*Terrence F. McVern,* for interested party Allegheny County.
*E.J. Strassburger,* for interested party Township of Findlay.

WETTICK, *J.,* January 19, 2001—This opinion and order of court addresses the question of whether a retail facility (It's a Burgh Thing) at the Midfield Terminal Complex of the Pittsburgh International Airport which sold Pittsburgh-related souvenirs and novelty items is exempt from real property taxation. The municipality (Township of Findlay) and the school district (West Allegheny School District) in which the facility is located, contend that the facility can be taxed. Allegheny County supports the position of the operators of the facility that the property is tax-exempt.

Even though it is also a taxing body, Allegheny County takes the position that the food and retail concessions at the airport are tax-exempt for obvious reasons. Allegheny

County is the owner of the airport. Allegheny County leases the areas of the airport that were constructed for food and retail concessions to BAA-Pittsburgh which, in turn, subleases these areas to entities that operate food and retail businesses at the airport.

The current lease between Allegheny County and BAA-Pittsburgh requires BAA-Pittsburgh to assume responsibility for real estate taxes that may be imposed. Most current leases between BAA-Pittsburgh and the operators of the retail businesses shift this responsibility to the subtenant. However, when these leases expire, the amount of rent that Allegheny County can charge under the new leases will depend on whether or not the locations are exempt from real estate taxation. If a facility is not exempt from real property taxation, the amount of rent that Allegheny County would otherwise receive (either from the operator of each facility or through a payment from the tenant of the entire area used for food and retail concessions) will be reduced because of the taxes paid to the three taxing bodies. Consequently, to the extent that property of the airport is taxable, the taxpayers of Allegheny County will be indirectly paying these municipal and school district taxes.

In a November 22, 2000 opinion and order of court, I addressed the question of whether the food and beverage facilities of the airport are exempt from real property taxation. In the present case, the parties have submitted the same types of evidence that I considered in addressing the question of whether these food and beverage facilities are tax-exempt. The same legal standards apply. Consequently, much of this opinion uses identical language from my prior opinion.

The General County Assessment Law (72 P. S. §5020-204(a)(7)) exempts public property used for public purposes from real property taxation.[1] It is the position of Findlay/West Allegheny that the commercial property which they seek to tax is not public property used for public purposes.

With the agreement of all parties, the evidence presented at the de novo hearing consisted of depositions filed with this court, including exhibits introduced through the depositions.

There does not seem to be any significant dispute over the controlling legal standard. The key to an exemption is evidence establishing that the lessee's use of public property is furthering the purpose of the governmental agency from which the lessee rents the property. *Pier 30 Associates v. School District of Philadelphia,* 89 Pa. Commw. 505, 493 A.2d 126 (1985). Public property that is used for public purposes is exempt from real property taxation even though it is leased to private operators who derive a profit from using the public property for public purposes. *May Department Stores Co. v. City of Pittsburgh,* 31 Pa. Commw. 398, 401, 376 A.2d 309, 311 (1977). However, public property that is leased to a private party is not exempt where the lessee's use is not for a public purpose. *Appeal of H.K. Porter Company,* 421 Pa. 438, 219 A.2d 653 (1966). Furthermore, public property leased to a private party is not exempt simply be-

---

1. Article VIII, Section 2(a)(iii) of the Pennsylvania Constitution provides that the General Assembly may by law exempt from taxation that "portion of public property which is actually and regularly used for public purposes."

cause the rentals are used by the governmental body for a public purpose; the use by the private party must be for a public purpose. *Pittsburgh Public Parking Authority v. Board of Property Assessment, Appeals and Review,* 377 Pa. 274, 105 A.2d 165, 168 (1954).

In *Wesleyville Borough v. Erie County Board of Assessment Appeals,* 676 A.2d 298 (Pa. Commw. 1996), the court summarized the law as follows:

"Our Supreme Court has further stated that the fact that property of a public body is leased to another entity, even a private party deriving profit therefrom, will not defeat the tax exemption if the property is being used for the specifically authorized public purpose for which it was acquired. *Pittsburgh Public Parking Authority v. Board of Property Assessment,* 377 Pa. 274, 105 A.2d 165 (1954). The controlling test for tax exemption is not whether the property or part of it has been leased out, but whether the use of the property so leased is for a public purpose. . . . This court has also stated that the crucial point is not whether the public body is benefitted by the use of the leased property but whether the use is, in fact, public. . . .

"Where the primary and principal use to which property is put is public, the mere fact that income is incidentally derived from the use of the property does not affect its character as property devoted to a public use. . . . On the other hand, property that is owned by a tax-exempt entity is taxable if the property is used for commercial purposes or is rented to a lessee for a purely business enterprise and not a public use." 676 A.2d at 302. (citations omitted)

The taxing bodies and the operators of the food and beverage facilities rely on the following two cases which considered the taxability of certain portions of the prior Pittsburgh Airport: *Moon Township Appeal,* 387 Pa. 144, 127 A.2d 361 (1956) *(Moon I); Moon Township Appeal,* 425 Pa. 578, 229 A.2d 890 (1967) *(Moon II).*

In *Moon I,* the taxing bodies sought to tax most of the concession areas. The county, as owner of the airport, had rented concession areas to private individuals and corporations. The Supreme Court's opinion stated that the trial court considered the following business activities: "jewelry store, display windows and display areas, drugstore, newsstand, 60-room hotel, nightclub, banquet rooms, coffee shop, cafeteria, cocktail lounge, tavern, service bar and roof patio, sandwich shop, bakery, check rooms, roof garden restaurant and cafe, amusement arcade, barber shop, confectionery, parking garage (indoor), women's apparel shop, garbage and rubbish collection service, dairy bar, toy shop, car rental service, fruit store, wholesale lumber sales office, catering service, insurance agency, taxi service, limousine service, gift shop, motion picture theater, linen supply service, coin-operated binoculars, parcel lockers, toy sales stand, steel company sales office, private lounge and bar, bank, and real estate office. The outside areas leased to concessionaires are the parking lots, the refreshment stand, comfort station and automobile service station, while the two dwelling houses are rented to private individuals." 387 Pa. at 147-48 127 A.2d at 363-64.

The trial court ruled that only the following activities were exempt: the coffee shop, cafeteria, sandwich shop, check rooms, barber shop, parking garage, garbage and

rubbish collection service, catering service, taxi service, limousine service, and parking lots. The county appealed. The Pennsylvania Supreme Court affirmed.

The court stated that commercial activities at the airport are not tax-exempt if they only serve the convenience of the traveling public. Instead, it must be shown that they were needed for the efficient operation of the airport as a public instrumentality and thereby partook of the character of its own public use. *Id.* at 150, 127 A.2d at 364.

The court ruled that the trial court had properly applied this standard:

"Based on that criterion it would seem clear that the court properly held taxable those areas occupied by concessionaires which could not, by any proper interpretation of 'reasonable necessity,' be held to enjoy a tax-exempt status, even though their activities may have been similar to those frequently associated with large airports. The court pointed out that while the service of food and refreshment was no doubt an essential activity for the benefit of the patrons of the airport, it would not include as a reasonable necessity, nightclubs, cocktail lounges, and the like, and therefore the nightclub, cocktail lounge, service bars, tavern, roof garden restaurant and cafe, banquet rooms, private lounge and bar, were taxable. Further, that the jewelry store, display windows and areas, drugstore, newsstand, bakery, amusement arcade, confectionery, women's apparel shop, dairy bar, toy shop, car rental service, fruit store, gift shop, motion picture theatre, linen supply service, coin-operated binoculars, and toy helicopter sales stand, were nothing more than

attractions for the patrons; therefore they also were taxable. That, as there was no reasonable necessity at the airport for the bank, the lumber sales office, the insurance agency, the steel company sales office, or the real estate office, all these were likewise taxable. That the hotel was taxable in view of the proximity of other suitable accommodations for travelers who, because of delay in making connections, might be required to stay overnight or for an extended period during the day. That while the parking areas were reasonably required for passengers going to and from the airport in cabs and automobiles, no such necessity was shown for the refreshment stand, comfort station, or automobile service station within that area, nor for the dwelling houses, all of which were therefore taxable." *Id.* at 150-51, 127 A.2d at 365.

In a dissenting opinion, Mr. Justice Jones accused the majority of deeming "the answers to the issues involved as being conclusively determined by the lower court's factual findings to which finality is accorded on the ground that there is evidence to support them [when] [a]ctually, the material facts are not in dispute." *Id.* at 152, 127 A.2d at 365 (dissenting opinion). He opined that what is called for is a conclusion of law as to whether under the established facts the contested uses of the airport property either serve a public purpose or are reasonably essential to a public service. He was particularly critical of the ruling as to the hotel; in his opinion, hotel facilities for airport passengers at the airport are a necessity. He concluded his dissenting opinion by stating that the order affirming the trial court does not preclude a re-examination of the subject matter upon a sub-

sequent triennial assessment where "[a]dditional proofs can then, and no doubt will, be adduced to demonstrate beyond reasonable dispute that many of the presently assessed uses of the terminal property are in furtherance of the authorized public use of the airport." *Id.* at 154-55, 127 A.2d at 366 (dissenting opinion).

*Moon II* considered four properties that had been denied tax-exempt status in the previous litigation: the hotel, a restaurant known as "The Fountain Room," a newsstand and a drugstore. The county had appealed from the assessment board's ruling in subsequent triennial assessments that these facilities were subject to assessment and taxation. The trial court, on the basis of extensive findings of fact, concluded that the hotel, the restaurant, the newsstand, and the portion of the drug- store used for the sale of food were tax-exempt. *In re Appeal of County of Allegheny,* 114 P.L.J. 463 (1966). The township and school district appealed as did the drugstore with respect to the portion of the facility that was utilized for the sale of drugs, gifts, novelties, and other miscellaneous items. The Pennsylvania Supreme Court affirmed. The Supreme Court used the same standard that it used in *Moon I:*

" 'There is likewise no question but that property the use of which is *reasonably necessary* for the efficient operation of the airport, even though not indispensable or essential thereto, is also entitled to exemption. Nor can such property be denied exemption merely because it is rented out by the airport and thereby yields a return which serves to reduce expenses, because, where the primary and principal use to which property is put is public, the mere fact that an income is incidentally de-

rived from it does not affect its character as property devoted to a public use. [citations] On the other hand, however, there is equally no doubt that property, even though owned by a body ordinarily tax-exempt, is taxable if used by it for commercial purposes, or if rented to a lessee for a purely business enterprise and not a public use; this is true even though the rentals or other proceeds from the property are devoted to the tax-exempt activities of the lessor. [citations]' (original emphasis)

"While the law is clear, its application to the facts is difficult. The line of demarcation between what is 'reasonably necessary for the efficient operation of the airport' and that which serves only the convenience of the traveling public is not easily fixed." 425 Pa. at 581, 229 A.2d at 891, quoting from *Moon I,* 387 Pa. at 148-49 127 A.2d at 364.

The court concluded that it could not say as a matter of law that the trial court erred in its conclusion that the hotel, restaurant, newsstand, and drugstore food bar are reasonably necessary for the efficient operation of the airport because the "facilities required to meet the needs of today's traveling public are a far cry from early days of commercial air transportation, and the Greater Pittsburgh Airport has undoubtedly tried to keep up with the demands of the times. It has provided everything necessary to make it an efficient operation and this has contributed to its expansion and improved service." 425 Pa. at 582, 229 A.2d at 892.

The Supreme Court opinion focused on the hotel. The opinion referred to the evidence showing that it is needed (its occupancy rate has never gone below 90 percent),

that it serves the traveling public rather than local residents (99 percent of its guests are from out of town), and that the county exercises substantial control over its operation through an agreement which controls the prices charged, the hours of operation, and the conduct and service of the employed personnel towards the traveling public. The Supreme Court found that the hotel provides "a much needed, if not an absolutely required, service." *Id.*[2]

It is questionable that the different outcomes in *Moon I* and *Moon II* turned on whether or not the trial judge attached a label of "reasonably necessary" to the services offered by the lessee in the situation in which the basic facts were not in dispute. It is very possible the different outcomes were the result of a decision to apply to municipal airports the same standards that had been applied to other public properties in prior cases.

In *New Castle v. Lawrence County,* 353 Pa. 175, 44 A.2d 589 (1945), the trial court found to be taxable certain portions of a municipal park, namely a funny-house, a pavilion, a merry-go-round, a restaurant, and an amusement building.

---

2. The trial court opinion focused on both the hotel and the Fountain Room. The trial court ruled that the Fountain Room was tax-exempt because approximately 90 percent of its patrons are airline passengers or airline personnel and any concession which is providing food and refreshments to the public in transit is providing an essential service. The court stated that it is "essential" that food services be provided at the airport because airlines do not provide food to all passengers and any food that is provided by the airlines does not meet the needs of passengers whose flights are delayed. 114 P.L.J. at 470.

The Pennsylvania Supreme Court reversed, stating:

"These buildings are part of the park equipment available for the entertainment and refreshment of the public visiting the park, and promote and facilitate the enjoyment of the park for park purposes. The Department of Parks and Public Property of the City of New Castle has control over the portions of the park in which these licensees or lessees operate. No reason has been suggested why park visitors who desire refreshment or special entertainment should not pay reasonable charges for such additional park privileges. If the city directly, instead of by licensees, furnished these benefits, it could make a reasonable charge therefor. As it acts in a proprietary capacity, it is immaterial that it finds it more convenient to supply refreshment and entertainment by its licensees." *Id.* at 182, 44 A.2d at 593. (citation omitted)

In this same case, the trial court ruled that a municipal golf course which included buildings used for the sale of sandwiches, soft drinks, golf balls, golf clubs, cigarettes and cigars, a restaurant, a club room, space for golf racks for customers, and a repair shop was not tax-exempt because fees are charged just as in the use of any ordinary privately owned golf course. The Pennsylvania Supreme Court reversed, holding that the entire facility was tax-exempt because it is "common knowledge that municipalities maintain public golf courses in their parks just as they maintain baseball diamonds, tennis courts, and playgrounds equipped with appropriate devices [and] it is also common knowledge that, frequently, reasonable charges are imposed toward the reduction of the general maintenance cost. The city has shown its right

to immunity from taxation complained of on the ground the property sought to be taxed is public property for public purposes within the statute." *Id.* at 181, 44 A.2d at 592.

Under the case law, I begin my analysis by considering the public purpose that the governmental body seeks to achieve. I then consider whether or not the uses of the facility that the taxing bodies seek to tax are reasonably necessary to accomplish the public purpose that the governmental body seeks to achieve.

The new airport was intended to be the "catalyst for the revitalization of the local economy." *Request for Proposals, Master Lessee-Developer of Retail Concessions.* See exhibit 3, July 27, 1999 deposition of Mark Knight, p. 4. Testimony that I will discuss establishes that the airport was designed to function as a hub where a majority of the passengers using the airport would be transferring from one aircraft to another. The airport is designed, constructed and operated for the hub passengers. Retail facilities are an integral part of the operations of the airport as a hub. Because of the retail facilities, airlines are more likely to utilize the airport as a hub. Thus, the design of the airport included areas throughout the airport for food, beverage and retail facilities.[3]

The majority of the customers of the retail facilities are hub passengers and airline crew. Less than 1 percent

---

3. The airport was constructed to include 90 concession areas scattered throughout the airport that occupy approximately 121,000 square feet of concession space. See exhibit 3, July 27, 1999 deposition of Mark Knight, p. 10.

of the customers of the retail facilities were at the airport for reasons that had no relationship to air travel.

Kent George, the executive director of the Allegheny County Department of Aviation, testified that the modern day trend in airport design and operation involves retail, food, beverage and the like. (T. 10-11.)[4] Airports must be self-sufficient; they must provide services such as magazines, food, refreshments, and retail facilities in order to encourage the use of the airport. (T. 11.) The concept of an airport that incorporates retail, food, and beverage facilities was pioneered in Allegheny County; it is now recognized and utilized throughout the world in modern airport development. (T. 12.) He knows of no airport development in the United States since Pittsburgh International was opened in 1992 that has not incorporated retail space. (T. 13.) The airport cannot maintain itself as a quality, international airport without a significant passenger base. Retail and food services are necessary in order for airlines to use Pittsburgh as a hub. (T. 29-33.)

He testified that the Pittsburgh International Airport is essentially a small city, containing a little more than 10,000 acres. The county is responsible for the entire operation, maintenance, development, day-to-day functioning, and future planning of the facility. The facility includes its own police department, fire department, and emergency management. (T. 14.) While the airport is

---

4. Mr. George is responsible for the operation, maintenance, development and planning of the Allegheny County airport system which includes the Pittsburgh International Airport.

located within Findlay and Moon Townships, it does not look to these municipalities for any support. It pays for any services that they provide, such as water and sewage. (T. 15.)

Mr. George testified that approximately 15 million of the roughly 21 million passengers coming through the Pittsburgh Airport are making connections. (T. 21.) He testified that the retail space is necessary for the airport's operation because the opportunity to shop while waiting for a connection makes it more likely that a passenger will select flights that go through Pittsburgh. (T. 21.)

Mark Knight is the president of BAA-Pittsburgh. He testified that BAA has the responsibility to lease, develop, and manage all of the retail services based within the airport. (T. 11.) BAA-Pittsburgh obtained its lease with the county by responding to an August 1990 request for proposals for a lessee-developer of retail concessions. (Exhibit 3, Knight deposition.) The airport project included a concession program for accomplishing the county's goal of creating a world-class facility that would attract airlines through increased passenger services. (T. 9.) The county constructed the Midfield Terminal Complex to include in excess of 121,000 leasable square feet of food/beverage, retail and service space. (P. 18, exhibit 3.) The purpose of the concession program was to provide airport patrons with first-class quality stores and service. (P. 18.) The county was seeking a concession program "comparable to the highest quality mixed use retail developments in the country." (P. 19.) The master lessee-developer was required to develop a comprehensive retail development plan that would "describe with particularity the strategies for ac-

complishing the county's goal of creating a world-class retail component to the Midfield Terminal Complex." (Exhibit 3.)

The concession program has always been an important component of an airport that was developed to serve hub passengers. The prior airport terminal was constructed primarily to serve air travelers who began or ended their flights in Pittsburgh. Neither the facility nor the location of the retail space was appropriate for hubbing passengers. Once the airport became a hub for USAir, there needed to be a whole different type of structure. (T. 39.)

The construction of the new airport included space for food, beverage and retail concessions throughout the airport. These concessions are vital in Pittsburgh because 70 percent of the people that pass through are transfer passengers. (T. 50.)

The leases between BAA-Pittsburgh and each of the food, beverage and retail concessions place numerous restrictions and conditions on the manner of operation. The two most significant involve store hours and pricing. Each establishment must be open every day of the year. Most must be open from 6 a.m. until 10 p.m. (T. 63-68, Knight deposition.) As part of the mall concept, there is street pricing at the airport. None of these businesses may charge more for their food, beverages, and retail goods than the going rate at non-airport locations within Allegheny County. (T. 75-76, Knight deposition.)

If I viewed the claim for a tax exemption raised by It's a Burgh Thing as the same claim for a tax exemption that was raised by the food and beverage subtenants, I

would have simply issued a one-page memorandum which referred to my November 22, 2000 opinion and order of court holding that the portions of the Midfield Terminal Complex occupied by food and beverage subtenants are exempt from real estate taxes imposed by the County of Allegheny, the Township of Findlay, and West Allegheny School District, However, the issues are not the same.

The *Moon I* and *Moon II* standard is whether the use made of the property is reasonably necessary for the efficient operation of the airport. Airlines do not assume responsibility for feeding their passengers. Food and beverage concessions are vital because 70 percent of the people who pass through the airport are transfer passengers. The airlines now look to the airport facility to meet the needs of travelers who require food and beverage services. In my November 22, 2000 opinion, I stated that the food and beverage facilities were tax-exempt because

"Each facility is furnishing food and beverage items that are consumed by the traveling public during the period in which they are traveling to their final point of destination. Consequently, they are necessary for the efficient operation of the airport." (Pp. 22-23.) (footnote omitted)

The claim of It's a Burgh Thing for a tax exemption is not the same because the items purchased from It's a Burgh Thing are not consumed or otherwise utilized by the traveling public during the period in which they are traveling to their final point of destination. In addition, they are not items that passengers may require while they are traveling.

Nevertheless, W.H. Smith Inc. would prevail if its fact situation is similar to the fact situation in *City of New Castle v. Lawrence County, supra,* in which the municipal golf course included a building used for the sale of golf balls, golf clubs, etc. However, the relevant facts are not the same because, in *City of New Castle* the items that are purchased are used by the public in connection with their use of the public facility.

The Township of Findlay and the West Allegheny School District would clearly prevail if the W.H. Smith Inc. fact situation is identical to the fact situation in *Public Parking Authority Pittsburgh v. Board Property Assessment, Appeals and Review, supra,* in which the public authority leased the first floor of a parking garage for commercial uses (rentals for a restaurant, tailoring establishment, sale of flowers and an electric protective agency). However, the relevant facts are not the same because these commercial spaces were not intended primarily to serve persons using the parking garage or to attract parkers to the garage. The rentals provided a revenue stream to defray expenses of the authority (*i.e.,* the space was more valuable as retail space rather than for parking).

In the present case, in all likelihood, retail space was not included as part of the airport because of the revenue that it would produce. In all likelihood, the rentals will never cover the increased construction and maintenance costs. The purpose of the retail space is to encourage a greater use of the airport as a hub.

A convincing argument can be made that retail space that represents a capital expenditure on the part of Al-

legheny County to further the purpose of the airport as a catalyst for the revitalization of the local economy should be tax-exempt. This capital expenditure is reasonably necessary to further the public purpose for the airport. Since the airport is tax-exempt because it furthers a public purpose, any essential component should be tax-exempt.

However, the two Pennsylvania Supreme Court cases that addressed the tax-exempt status of facilities at the airport *(Moon I* and *Moon II)* do not appear to address tax-exempt applications in this fashion. Instead, the focus appears to be on the needs of the passengers.

In *Moon II,* the appeals included the taxability of a drug store. The trial court had found to be tax-exempt only the portion of the drugstore utilized for the sale of food. This portion of the ruling that denied a tax exemption for the remainder of the drug store was also a part of the appeal. The Pennsylvania Supreme Court affirmed the entire ruling of the trial court. With respect to the appeal involving the remainder of the drugstore, the court stated, without explanation, that it found no error in the lower court's "conclusion that the drugstore area utilized for the sale of drugs, gifts, novelties and other miscellaneous items was not tax-exempt." 425 Pa. at 583, 229 A.2d at 892.

The present case does not involve the sale of items that are likely to be used by travelers while waiting at the airport or while flying to their final destination. Neither does this appeal involve items that a traveler may need while he or she is away from home. The only relationship between the retail items sold by the It's a Burgh

Thing and airline travel is that the purchasers of these items are using the airport in the manner in which it was intended to be used. This does not appear to be a sufficient nexus.

For these reasons, I enter the following order of court:

## ORDER

On January 19, 2001, it is hereby ordered that:

(1) the portion of the Midfield Terminal Complex occupied W.H. Smith Inc. for its operation of the retail store, It's a Burgh Thing, is subject to real estate taxes imposed by the County of Allegheny, the Township of Findlay and West Allegheny School District;

(2) the application of W.H. Smith Inc., d/b/a It's a Burgh Thing for tax-exempt status is denied; and

(3) the decision of the Allegheny County Board of Property Assessment, Appeals, Review and Registry placing this property in the taxable category for 1998 and thereafter is affirmed.